Olive **DAVIS**, Plaintiff,

v.

**RIO RANCHO ESTATES, INC.,**
**et al., Defendants.**

No. 75 Civ. 1779.

United States District Court,
S. D. New York.

July 28, 1975.

Turchin & Topper, New York City, for plaintiff.

Jacobs, Persinger & Parker, New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Plaintiff, suing in her own right, and in behalf of a purported class consisting

of others similarly situated,[1] purchased a ½ acre parcel of unimproved land in a residential subdivision known as Rio Rancho Estates near Albuquerque, New Mexico. Defendant Rio Rancho Estates, Inc. ("Rio Rancho"), a division of defendant Amrep Corporation ("Amrep") was the seller, pursuant to an executory instalment sale agreement. The individual defendants are officers or directors of Amrep.

The Purchase Agreement was signed by plaintiff on November 10, 1968 and accepted by Rio Rancho. The purchase price of a specified parcel, $1,995, was to be paid over a five-year period in instalments of $26 per month, including interest. Plaintiff continues to make these monthly payments, and the agreement provides title will be conveyed to her when the purchase price and interest are paid in full.

The complaint alleges that the advertising and promotional materials, and offering statement, Rio Rancho and Amrep issued in July 1968, upon which plaintiff relied, contained fraudulent material misrepresentations and omissions which induced plaintiff to purchase the property at an artificially inflated price. Contrary to defendant's representations, plaintiff claims (Complaint, ¶8):

"[T]he property is virtually worthless and useless, is desert land, is unreachable by car and is without power, water or other community developments and . . . the pictures of the property were false in that the grass was painted green and pine cones were hung on the trees for purposes of making the property look more attractive."

Plaintiff alleges defendants' conduct violated the antifraud provisions of the Securities Exchange Act of 1934 [15 U.S.C. § 78j] and Rule 10b–5 promulgated thereunder, and the Interstate Land Sales Full Disclosure Act [15 U.S.C. § 1703(a)] "Land Sales Act") and in addition, constituted common law fraud.

On July 11, 1975, this Court heard defendants' motion to dismiss the complaint pursuant to Rule 12(b), F.R.Civ. P., on the grounds that the complaint fails to state a claim upon which relief can be granted and that the Court lacks subject matter jurisdiction. Defendants urge that the securities law claim must be dismissed because the lots they sell are not "securities" within the meaning of the Securities Exchange Act, and that the Land Sales Act claim must be dismissed because the statute was not in effect at the time of the sale to plaintiff. Since there is no federal cause of action, defendants urge that the exercise of pendent jurisdiction over the state claim would be improper, and it also must be dismissed.

■■ The question presented by this challenge to the sufficiency of the complaint is whether it fails to state a claim upon which relief may be granted, and not whether there is a lack of subject matter jurisdiction. *Calhoon v. Harvey*, 379 U.S. 134, fn. 9, p. 137, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78aa and 15 U.S.C. § 1709. The complaint adequately alleges subject matter jurisdiction, and [*Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)]:

"[T]he court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief . . . . .

\* \* \* \* \* \*

If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction."

1. The purported class plaintiff seeks to represent consists of all persons who purchased an interest in real property from Rio Rancho or Amrep between November 10, 1968 and April 11, 1975, the date the complaint was filed.

## I. *The Land Sales Act Claim*

As noted, plaintiff signed the Purchase Agreement on November 10, 1968. The Land Sales Act was enacted on August 1, 1968, but Pub.L. 90–448 provides that:

"This title shall take effect upon the expiration of two hundred and seventy days after the date of its enactment."

The Act thus became effective on April 28, 1969, more than five months after plaintiff's purchase.

■ A statute will be given prospective application absent an expression in the statute or its legislative history of an unequivocal Congressional intent to the contrary. *Greene v. United States*, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Farmington River Power Co. v. Federal Power Commission*, 455 F.2d 86 (2d Cir. 1972). There is nothing in the Land Sales Act or in its legislative history to indicate Congress intended the Act to have retrospective effect. See 1968 U.S.Code Cong. and Admin.News, p. 2873.

Plaintiff contends that the underlying transaction is covered by the Land Sales Act even though the Purchase Agreement was executed before the effective date of the Act. Legal title to her lot has not yet been conveyed by delivery of a deed, and therefore, she claims, the sale is a continuing, incomplete transaction.

■ It is a venerable rule of equity jurisprudence that upon the execution of a contract for the sale of real property, equitable title vests immediately in the purchaser, and the seller retains legal title only, as security for the remainder of the purchase price. *Williams v. Haddock*, 145 N.Y. 144, 39 N.E. 825 (1895). Plaintiff cites no contrary authority, from New York or from New Mexico, whose law, under familiar conflict of laws principles, ordinarily would apply to a contract for the sale of land in that state.

Pursuant to paragraph 5 of the Agreement, upon full payment, either in instalments or by prepayment without penalty, plaintiff has a right to demand her deed. Rio Rancho has the right, pursuant to paragraph 11 of the Agreement, to terminate the contract when the plaintiff has been in default for a 60-day period in the payment of any monthly instalment. After written notice to plaintiff, if any default is not cured, all past payments may be retained by Rio Rancho and plaintiff then will have no further interest in the land.

■ These contractual rights and obligations were fixed when Rio Rancho signed and returned a copy of the Agreement to plaintiff, and the Agreement became binding and enforceable upon both parties at that time. Any fraud was complete and actionable on that date, or as soon thereafter as plaintiff knew or should have known she had been defrauded. The Land Sales Act does not require a different result. The Act and regulations promulgated thereunder contemplate that an enforceable contract exists before the delivery of a deed. For example, § 1703(b) provides:

"Any contract or agreement for the purchase or leasing of a lot in a subdivision covered by this chapter, where the property report has not been given to the purchaser in advance or at the time of his signing, shall be voidable at the option of the purchaser. *A purchaser may revoke such contract* or agreement *within forty-eight hours, where he has received the property report less than forty-eight hours before he signed the contract* or agreement . . . ." [Emphasis supplied.]

The regulations, 24 C.F.R. § 1710.1(n), provide that:

" '*Sale' means any obligation* or arrangement for consideration *to purchase* or lease *a lot* directly or indirectly." [Emphasis supplied.]

Clearly, both the statute and the regulations recognize that there is a valid agreement upon the execution of an executory contract for an instalment sale.

The parties having executed the Agreement before the effective date of the Land Sales Act, the complaint fails to state a claim for relief thereunder.

## II. *The Securities Exchange Act Claim*

Rio Rancho's advertising materials state that the value of land in the area of Rio Rancho Estates is increasing and that purchasers "have every right to expect that your land should rise substantially in value over the coming years . . . ." (Ex.B to Plaintiff's Aff't dated June 30, 1975, p. 13)

Plaintiff claims that the property was offered as an investment only, and that she purchased it for that purpose, expecting it to appreciate in value through the sole efforts of the defendant promoters. The Purchase Agreement, she alleges, is therefore an "investment contract" as defined in *SEC v. Howey,* 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946):

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."

In *Howey, supra,* the promoters offered units or segments of a citrus grove to the public. The purchaser signed a land sales contract, receiving a fee simple interest in the land, and a service contract whereby the managers cultivated and marketed the fruit and the investors shared in the proceeds. The individual owners, often residents of distant states, could not have developed or occupied the land themselves due to the small size of the plots. Only if the plots were combined into commercially feasible citrus groves managed by others could the investors expect any return on their investment. It was held,

therefore, that the transaction was the sale of a security within the securities laws.

In a recent case concerning sale of an interest in real estate, the Supreme Court held that shares of stock in a co-operative apartment are not securities [*United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)]. The tenant-owners claimed they were paying higher carrying charges than had been advertised in the "Co-op City" Information Bulletin they received when they purchased their cooperative apartments prior to completion of construction, and that this misrepresentation of the amounts of the carrying charges violated Rule 10b–5. The Court held 421 U.S. at 858, 95 S.Ct. at 2063:

"There is no doubt that purchasers in this housing cooperative sought to obtain a decent home at an attractive price. But that type of economic interest characterizes every form of commercial dealing. What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use."

Even if plaintiff, unlike the plaintiffs in *United Housing, supra,* never intended to use the property as a residence and did purchase her property purely for the profit she expected on resale, the Purchase Agreement nevertheless is not an investment contract as defined in that case or in *Howey, supra.*

Although the two themes are interwoven throughout the brochures, defendants' promotional materials, fairly read, place more emphasis on development of a residential community than on purchase as an investment. It is inaccurate to say "this development was being promoted as a pure investment, as opposed to a residential development which may,

incidentally, be also a good investment." (Plaintiff's Memo. in Opposition, p. 5)

Vacant land in arid New Mexico would not have increased in value appreciably had it not been developed. Obviously, if plaintiff did not intend to build, she believed defendants' glowing reports, be they normal puffery or fraudulent misrepresentation, that Rio Rancho Estates was a "booming" development with many homes completed or being built:

"Rio Rancho Estates . . . a sparkling new development featuring spacious 'Rancho' estates nestling among gently rolling hills with many lovely homes springing up in our residential areas. . . ." (Ex.B, *supra*, p. 7)

■ If defendants in fact built roads and other improvements, this is not the type of managerial service contemplated in *Howey, supra,* or *United Housing, supra.* Defendants did not promise to run the development and distribute profits to the plaintiff, as did the operators of the orange groves in *Howey.* There was no management contract between plaintiff and defendants, nor were defendants obligated by the Purchase Agreement to perform any such services. Defendants' attempts to induce purchasers to build or their efforts, if any, to enhance living conditions in the development were unrelated to plaintiff. Their interest was in recouping their investment, making a profit and moving on. Any benefit to plaintiff would be purely incidental.

■ In the absence of a "common enterprise" between the parties, the expectation of a profit on resale is insufficient to transform what is essentially a sale of real property into the sale of an investment contract:

"Plaintiff's effort to shoe-horn their land speculation into the definition of the Securities Acts in our opinion fails. They have alleged only a superficial similarity with the leading cases on this point and have not distinguished their transactions from any

other agreement to purchase real estate in undeveloped land." *Bubula v. The Grand Bahama Development Co.,* (N.D.Ill. June 7, 1974, unreported decision, pp. 4–5)

The plaintiffs in *Bubula* alleged that written contracts for the purchase of undeveloped land on Grand Bahama Island were investment contracts. The Court disagreed and dismissed the complaint. Contracts for the purchase of undeveloped lots in recreational subdivisions in California were held not to be investment contracts in *Happy Investment Group v. Lakeworld Properties, Inc.,* 396 F.Supp. 175 (N.D.Cal., 1975). See also *Contract Buyers League v. F&F Investment,* 300 F.Supp. 210 (N.D.Ill. 1969) and 1 Loss, Securities Regulation, pp. 491–2 (2d ed., 1961):

"The line is drawn, however, where neither the element of a common enterprise nor the element of reliance on the efforts of another is present. For example, no 'investment contract' is involved when a person invests in real estate, with the hope perhaps of earning a profit as the result of a general increase in values concurrent with the development of the neighborhood, as long as he does not do so as part of an enterprise whereby it is expressly or impliedly understood that the property will be developed or operated by others."

■ Plaintiff urges a different result here because the Purchase Agreement contains the following language [Ex.A, *supra,* ¶ 5]:

"All of the minerals in and under the lots are reserved by Seller, but the sale of the lot(s) shall include a perpetual right to receive one-half of all royalties and/or proceeds of actual mineral production to which Seller has become entitled and which are attributable to the lot(s), as and when such royalties or proceeds are received by Seller. . . ."

Thus, plaintiff claims she was granted a "fractional undivided interest in oil, gas, or other mineral rights" as defined in

the Securities Act of 1933 [15 U.S.C. § 77b(1)] and a "certificate of interest or participation in any profit sharing agreement or in any oil, gas, or other mineral royalty or lease" as defined in the Securities Exchange Act of 1934 [15 U.S.C. § 78c(a)(10)].

Mechanical application of the securities acts to anything that may literally fit the definitions in those acts has been specifically rejected by the Supreme Court [*United Housing Foundation, supra*, 421 U.S. at 849, 95 S.Ct. at 2059]:

"Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction: 'that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' [citations omitted]"

Clearly defendants are not in the mining or oil business, nor did they represent to plaintiff that they intended to commence such explorations, as was the case in *SEC v. Joiner Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). The "economic reality" of this transaction is the simple instalment sale of a parcel of real property. The mere possibility of future discovery of minerals or oil is too speculative, and too insubstantial, to bring this transaction within the securities laws.

The complaint therefore fails to state a claim under the Securities Exchange Act of 1934. Since it fails to state any federal claim, the exercise of pendent jurisdiction to adjudicate state claims of fraud is inappropriate. *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176 (2d Cir. 1974).

Defendants' motion to dismiss the complaint is hereby granted.

So ordered.