Gladys **HUSTED, Individually, and on behalf of others similarly situated, Plaintiff,**

v.

**AMREP CORPORATION et al., Defendants.**

No. 76 Civ. 338.

United States District Court, S. D. New York.

March 17, 1977.

Pa., for plaintiff. Stanley J. Levy, Max W. Berger, New York City, of counsel.

Jacobs, Persinger & Parker, New York City, for defendants. I. Michael Bayda, Joseph N. Salomon, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

Gladys Husted sues the defendants under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.* (ILSFDA) and for common law fraud. The defendants move to dismiss the complaint. Eulalie Bryan, plaintiff in 429 F.Supp. 313, also decided today, sues some (but not all) of the defendants named in *Husted* on similar grounds. She moves to certify the suit as a class action. Each case is brought as a class action, and the classes sought to be represented are overlapping. The cases are related,[1] and call for construction of identical or related portions of the Act. Although each case is discussed in a separate opinion, where issues raised in both warrant joint treatment reference to the other may appear.

### I. Background

On January 20, 1973, Gladys Husted entered into a "Reservation and Purchase Agreement" for the purchase of one half-acre lot in Unit 20 of the Rio Rancho Estates, at a price of $4,880. On April 24, 1973, she entered into a second "Reservation and Purchase Agreement" for the purchase of another half-acre lot in Unit 10 of Rio Rancho Estates, for $5,705. Rio Rancho Estates is a 91,000 acre tract of land in New Mexico, acquired in the 1960s for development and sale to the public. It has been subdivided into residential and commercial lots, which have been sold to thousands of customers throughout the United States and in some foreign countries. The land is sold through real estate brokers and by

Kreindler & Kreindler, New York City, and Richard S. Greenfield, Bala Cynwyd,

---

1. *Husted v. Amrep* was initially assigned to Judge Metzner, who transferred the case to Judge Lasker (to whom *Bryan v. Amrep* had been assigned) pursuant to Rule 13 of the Rules for the Administration of the Civil and Criminal Calendars Under the Individual Assignment System for the Southern District of New York.

means of advertisements in newspapers, radio and television, brochures and fliers, letters of solicitation, films and slides, sales visits to prospective customers' homes, and group dinner sales meetings. Some 1600 families are said to have built homes on their lots in Rio Rancho Estates, and various community and business facilities are said to exist there.

Most purchasers of land in Rio Rancho Estates sign their Purchase and Reservation Agreements without seeing the land they are buying. The broker then forwards the agreement to New Mexico for signature by Rio Rancho Estates, Inc. (one of the defendants). The "Reservation and Purchase Agreement", a standard form contract used in these sales, provides that: the down payment is followed by monthly installments of principal and interest over a period of five to eight years. Legal title does not pass to the customer until all payments under the contract have been made; the purchaser may prepay the remaining amount due at any time without penalty. If the buyer is in default more than sixty days (i.e., misses two or more monthly payments) the seller may send out a notice of default; if full payment is not made within fourteen days after the seller mails the notice, all of the buyer's rights are terminated and the seller retains all payments previously made as liquidated damages.

The contracts also provide for the following exchange or cancellation rights: (1) the buyer may cancel the contract and receive a full refund of payments if within six months of signing she inspects the property and decides she is unsatisfied; (2) if the buyer of a lot to which water and other utilities have not yet been extended decides she wants to build a home on the lot, the seller will without charge exchange her lot for one in a section to which such utilities have been extended; (3) within five years the buyer may exchange her property for any other lot of equal value located in Rio Rancho Estates. In addition, the contract provides, as is required by federal law, 15 U.S.C. § 1703(b), that the buyer may void the contract if she has not received a "property report" prepared in accordance with federal regulation at or before the signing of the contract, and may revoke the contract within forty-eight hours of signing it if a property report was not provided at least forty-eight hours before the signing. The record does not indicate that Ms. Husted visited Rio Rancho before signing the contract, or within six months thereafter, or that she ever sought to exercise any of the exchange or cancellation rights provided.

The complaint alleges that the defendant Amrep Corporation and its subsidiary, Rio Rancho Estates, Inc., are the owners and developers of Rio Rancho Estates. ATC Realty Corp. is claimed to be another subsidiary of Amrep, responsible for the sale of land in Rio Rancho Estates. The individual defendants are officers and/or directors of one or more of the corporate defendants.

In March, 1975 the Federal Trade Commission (FTC) publicly announced its issuance of a complaint against Amrep and its subsidiaries charging business practices in violation of 15 U.S.C. § 45 in the sale of land in Rio Rancho Estates, among which were: the form of contract being used; sales techniques in which people were induced to sales meetings by offers of free gifts or information which did not disclose the true purpose of the meetings; and the making of misrepresentations concerning the condition and value of the land. (Ex. I, Defendants' Motion to Dismiss) The FTC proceeding was temporarily suspended until resolution of criminal charges against the three corporate and several of the individual defendants named in these complaints, brought by a federal grand jury on October 28, 1975.[2] Ms. Husted filed her civil com-

2. The grand jury charged that the defendants devised a "scheme for obtaining money in excess of $200,000,000 . . . from purchasers of lots in Rio Rancho Estates by means of false and fraudulent pretenses, representations and promises. . . . It was the principal object of this scheme to defraud for the defendants . . . to acquire more than 91,000 acres of semi-arid desert grazing land . . . for approximately $180 per acre, to subdivide this desert land into approximately 86,000 lots of approximately one-half acre in size by bulldoz-

plaint on January 19, 1976. She claims that the defendants used high pressure sales techniques wrongfully to induce herself and other purchasers to buy land in Rio Rancho Estates at prices well over their actual market value and in so doing made various misrepresentations and misleading statements concerning, *inter alia* the investment value of the land; its potential resale market; the availability of water and other utilities to the lots; the exchange privilege provided by the contract; Rio Rancho's relationship to the City of Albuquerque.

## II. The Interstate Land Sales Full Disclosure Act (ILSFDA)

The passage of the ILFSDA as Title XIV of the Housing and Urban Development Act of 1968 was prompted by revelations of substantial "abuse in the sale of undeveloped land by promoters" in hearings held before the Senate Special Committee on Aging in 1964, and by its Securities Subcommittee in 1966–67. The Committee found that state law was inadequate to protect purchasers in interstate sales and federal enforcement mechanisms failed to provide any retroactive relief to innocent purchasers who may have lost "their entire life savings" by investing in shaky land deals. *Report of the Committee on Banking and Currency, U.S. Senate to Accompany S3497, Housing and Urban Development Act of 1968, Sen.Rep.No.1123,* 90th Cong.2d Sess., at 109. Modelled in large part on the Securities Act of 1933, the legislation was intended to

> "give the purchaser [of land] such information necessary to make his own determination of the quality of what is being sold . . . the seller of undeveloped land covered by this title would be required to inform the purchaser not only of the desirable but also of any undesirable aspects." *Id.* at 110.

In broad outlines, the Act requires developers of nonexempt land [3] to file with the Secretary of Housing and Urban Development (HUD) a "statement of record," which includes information on various subjects required by statute, and any other information required by the Secretary as necessary

---

ing dirt roads and staking boundary corners, and to describe and sell these lots as 'homesites' and 'commercial' lots in a 'masterplanned community' to persons throughout the United States at prices . . . which . . . presently range from approximately $6200 to $11,800 per acre for 'homesites' . . . The overwhelming majority of purchasers were intended to be and were persons who would not and did not purchase these lots except in reliance upon false and fraudulent pretenses . . . that such purchases were safe and secure financial investments which would appreciate rapidly and greatly in market value and could be resold at a substantial profit . .

[allegations of specific affirmative misrepresentations]

It was further part of this scheme . . . that the defendants . . . did deliberately conceal and fail to convey to the persons to be defrauded information . . . [to] show that the purchase . . . was not a sound risk-free investment, but was an exceptionally poor, risky and dangerous investment . . . that the overwhelming majority of the lots could not be resold at a profit or even at cost . . . that there had been virtually no resale market for these lots . . . that the defendants . . . had not and were not improving the lots sold with water, utilities and other customary amenities . . . that the defendants . . . had no expectation that Rio Rancho Estates could be or would be completely developed in less than 200 years, if ever . . . and that the growth of Albuquerque had not had and would not have any significant effect upon the ·demand for . . . lots at Rio Rancho Estates within any foreseeable future. . . ." The three corporate defendants charged in the indictment (those named in the instant complaint) and several of the individuals charged in the indictment were recently convicted of mail fraud and criminal violations of the ILSFDA after a jury trial before Judge Metzner. Appeals are pending.

3. Section 1702 of the Act exempts from its coverage certain sales of real estate, e. g., sales of lots in a subdivision all of which are five acres or more in size, or sales of real estate "not pursuant to a common promotional plan to offer or sell fifty or more lots in a subdivision." In addition, the Secretary is authorized to exempt from the Act's provisions other subdivisions or lots therein "if he finds that the enforcement of this chapter with respect to such subdivision or lot is not necessary in the public interest and for the protection of purchasers by reason of the small amount involved or the limited character of the public offering." There is no question that Rio Rancho Estates are covered by the Act's provisions.

to protect potential purchasers. 15 U.S.C. §§ 1704, 1705. Nonexempt land may not be sold until the statement of record becomes effective, and the Secretary has power to suspend the effective dates of statements of records if it appears "on its face incomplete or inaccurate in any material respect." 15 U.S.C. § 1706(b). The Act expressly provides, however, that "[t]he fact that a statement of record with respect to a subdivision has been filed or is in effect shall not be deemed a finding by the Secretary that the statement of record is true and accurate on its face, or be held to mean the Secretary has in any way passed upon the merits of, or given approval to, such subdivision." 15 U.S.C. § 1716.

Developers are also required to prepare a "property report" containing any information in the statement of record, or any other information, which the Secretary "may by rules or regulation require as being necessary or appropriate in the public interest or for the protection of purchasers." 15 U.S.C. § 1707(a). The statement of record is available for public viewing under regulations prescribed by the Secretary; a property report must be furnished every prospective purchaser before she signs any land sales contract. 15 U.S.C. § 1703(a)(1), (b).

Section 1709 of the Act establishes a civil cause of action in the federal district court by purchasers of land against developers or their agents who fail to comply with its requirements. Section 1703, incorporated by reference in § 1709(b)(1), further defines prohibited acts. Claims under §§ 1709(a) and 1709(b)(2) are essentially for misstatements or omissions in the reports required to be filed with HUD or delivered to the purchaser, whereas claims under § 1709(b)(1) for violation of § 1703 encompass a broader range of fraudulent behavior.

A developer may be sued for violating § 1709(a) whenever a statement of record contained "an untrue statement of a material fact or omitted to state a material fact required to be stated therein," and the purchaser brought land during the time the statement remained uncorrected. Suit under § 1709(b)(2) is authorized against a developer, or his agent, who "sells or leases a lot . . . by means of a property report which contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein." These provisions depart from the familiar language of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, on which they were modelled, which prohibits omissions of material facts "necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." (See also 15 U.S.C. § 77q(a)(2) in which identical language defines omissions of material facts). By regulation promulgated December 22, 1971, 36 Fed.Reg. 24739, however, the Secretary of HUD directed that

> "in addition to the information expressly required to be stated in the statement of record, there shall be added such further material information if any as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading." 24 C.F.R. § 1710.105(b).

Suit under § 1709(b)(1) is authorized against any developer, or his agent, who sells or leases a lot in violation of Section 1703. (Because Section 1703 is fully incorporated in § 1709(b)(1), for clarity's sake joint reference will be made to "Section 1709(b)(1) [§ 1703].") Section 1703(a)(1) makes it unlawful to sell or lease a lot unless a statement of record is in effect and a property report furnished to the purchaser in advance of signing the contract.[4] Sec-

---

4. Section 1703(b) provides specific relief to purchasers who do not receive a property report:

> "Any contract or agreement for the purchase or leasing of a lot in a subdivision covered by this chapter, where the property report has not been given to the purchaser in advance

or at the time of his signing, shall be voidable at the option of the purchaser. A purchaser may revoke such contract or agreement within forty-eight hours where he has received the property report less than forty-eight hours before he signed the contract or agreement, and the contract or agreement shall so

tions 1703(a)(2)(A) and (C) make it unlawful, "in selling or leasing, or offering to sell or lease, any lot in a subdivision (A) to employ any device, scheme, or artifice to defraud . . . [or] (C) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon a purchaser." Aside from the change in the phrase defining the operative event as "in selling or leasing" instead of "in connection with the sale," these provisions repeat those of S.E.C. Rule 10b–5, promulgated pursuant to § 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. Section 1703(a)(2)(B) does *not* adopt the language of its counterpart in Rule 10b–5(b),[5] but rather prohibits the developer, "in selling or leasing any lot" from "obtain[ing] money or property by means of a material misrepresentation with respect to any information included in the statement of record or the property report or with respect to any other information pertinent to the lot and upon which the purchaser relies." The intent of this prohibition, as the legislative history makes clear, is to prohibit misrepresentations of any information which may be accurately set forth in the statement of record or property report, as well as misrepresentations of any other pertinent facts *on which the purchaser relies*. Cf. 17 C.F.R. § 240.10b–5.

### III. Motion to Dismiss

Defendants move to dismiss this complaint on several grounds: that the claims under the ILSFDA are barred by relevant statutes of limitation; that the complaint fails to comply with the requirements of Fed.R.Civ.P. 9(b); that Count II of the complaint fails to state a claim upon which relief can be granted; that the common law

fraud count must be dismissed for lack of federal jurisdiction; and that Fed.R.Civ.P. 11 warrants striking the complaint.

### A. Statute of Limitations

1. *Count I*: Count I of the complaint alleges violations of § 1709(b)(1) [§ 1703] of the Act. The Act's statute of limitations reads, in full, as follows:

"No action shall be maintained to enforce any liability created under section 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 1709(b)(1) [1703] of this title, unless brought within two years after the violation upon which it is based. In no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser." 15 U.S.C. § 1711.

Plaintiff and defendants agree that her claim under § 1703 must be brought within two years of the violation and in any event no more than three years from the sale. There is no doubt that the complaint was filed within three but more than two years after the contracts were signed.

Defendants maintain that the § 1703 claim alleged in Count I is therefore precluded, arguing that the land was "sold" when the contracts were signed and that it is only upon this event that the "violation" complained of occurred. Plaintiff, on the other hand, notes that the statute appears to distinguish a "violation" from a "sale" and contends that the former term encom-

---

provide, except that the contract or agreement may stipulate that the foregoing revocation authority shall not apply in the case of a purchaser who (1) has received the property report and inspected the lot to be purchased . . . in advance of signing the contract, or agreement, and (2) acknowledges by his signature that he has made such inspection and has read and understood such report."

**5.** Rule 10b–5(b) makes it "unlawful for any person . . . by the use of any means or instrumentality of interstate commerce . .

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b).

passes a broader range of acts. She argues from this that an actionable "violation" of § 1703 may include fraudulent behavior which continues after the sales contracts were signed for the purpose of inducing the buyer to continue to make payments on the land. Since her complaint alleges such continued fraudulent acts, she claims the violation continued to within two years of the filing of the complaint. Alternatively she argues that the two year statute of limitations was tolled.

■ A preliminary observation on the wording of the Act's statute of limitations is appropriate. The language of the statute itself makes clear that Congress did not intend to apply an absolute bar on claims brought under Section 1709(b)(1) [1703] more than two years after a land sales contract was signed, or a "sale" occurred. Defendants would have us interpret the statute as if the three year umbrella limitations period applied only to claims under § 1709(a) or (b)(2).[6] But by virtue of its position in an independent sentence at the end of the paragraph, the three year limitations period must have been intended to have application to all of the claims (and their shorter limitations period) set forth in the preceding sentence. Thus, the statute clearly contemplates that some actions under § 1709(b)(1) [§ 1703] may be brought more than two years after the "violation" so long as they are within three years of the sale.

### (a) *Equitable Tolling*

There are several possible reasons why Congress provided that actions for violations of § 1703 must be brought within two years of the violation, but in no event more than three years after the sale. It might be

argued that Congress simply wanted to limit the impact of the equitable tolling doctrine, which is normally read into every statute of limitations on federal causes of action. *Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct. 582, 90 L.Ed. 743 (1946). "In no event" is strong and unambiguous language, and was held in *Hester v. Hidden Valley Lakes, Inc.,* 404 F.Supp. 580, 582 (N.D.Miss.1975) "to place an absolute limit on the length of time within which aggrieved persons must sue to enforce their rights under the act." See also *Cowsar v. Regional Recreations, Inc.,* 65 F.R.D. 394 (M.D.La.1974). It may be that the last sentence of § 1711 means only that the two year limitations period normally applicable to suits under § 1709(b)(1) [§ 1703] can be tolled for no more than one year on violations arising at the time of the sale.

■ Even if this were Congress' sole intent, the § 1703 claim could not be dismissed on statute of limitations grounds, in light of the allegations of ¶ 32 of the complaint that:

> "the defendants designed and devised and caused letters and promotional material to be sent to class members who purchased lots in Rio Rancho Estates in order to fraudulently induce them to continue to make payments on their contract and to make further and additional purchases and falsely advise class members that, among other things, their investment was rapidly increasing in value by reason of, among other things, the development of Rio Rancho Estates . . . ."

Defendants suggest that as a matter of law the limitations period cannot be equitably tolled by their activities, because they were conducted fully in the open. This argu-

---

**6.** If the three year umbrella limitations period were not intended to apply to suits for violations of § 1703 (authorized under § 1709(b)(1)), the statute of limitations section would have read:

> "No action shall be maintained to enforce any liability created under 1709(a) or (b)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasona-

ble diligence, and in no event shall any such action be brought by a purchaser more than three years after the sale or lease to such purchaser. No action shall be maintained to enforce any liability created under Section 1709(b)(1) [1703] of this title, unless brought within two years after the violation upon which it is based."

*But see* the language of the actual statute of limitations, 15 U.S.C. § 1711, reprinted in the text, *supra* at 10.

ment, however, would rewrite the law of equitable tolling by creating an untenable distinction between "overt" and "covert" frauds. The question is when plaintiff knew or should with reasonable diligence have known the basic elements of the fraud, or whether defendants took active steps to conceal the fraud from plaintiff. *Holmberg v. Armbrecht, supra,* 327 U.S. at 397, 66 S.Ct. 582; *Tomera v. Galt,* 511 F.2d 504, 509–10 (7th Cir. 1975); *Happy Investment Group v. Lakeworld Properties, Inc.,* 396 F.Supp. 175 (N.D.Cal.1975). Cf. *Melhorn v. Amrep Corp.,* 373 F.Supp. 1378 (M.D.Pa.1974). Plaintiff claims that defendants took additional affirmative acts after the purchase agreement was signed to continue the fraud. She also alleges that she could not have known of the fraud until "recently," after the FTC complaint issued and the indictment was handed up. It cannot be said that she could prove no set of facts under these allegations which would toll the two year limitations period.

Although decision in Husted's favor could rest on this ground alone, she makes several other arguments in response to defendants' contention that her § 1703 claim is time-barred.[7] Decision on certain of these points will be useful to the parties in this action (which has yet to be certified as a class), and is essential to certain aspects of the class action decision filed today in the related case of *Bryan v. Amrep, et al.* We proceed to consider whether in the absence of equitable tolling the prohibitions of § 1709(b)(1) [§ 1703] extend to behavior occurring after the land sales contract is signed.

### (b) *Continuing Violations*

Two other arguments have been made as to the meaning and effect of the statute of limitations on § 1709(b)(1) [§ 1703] claims. The first is that a "sale" for purposes of the three year umbrella limitations period is not complete until all installments have been made and legal title delivered. However,

Husted and *Bryan* (plaintiff in the related case referred to above) filed their complaints within three years of the earliest possible date at which it could be argued that a sale occurred (i. e. the date of their signing the "reservation and purchase agreement"). It is thus unnecessary to decide whether, for purposes of § 1711, a sale occurs when the purchaser signs, when the seller executes the contract, or not until payments have been completed and title delivered. Assuming, without deciding, that for these purposes a sale occurs when the plaintiff first assumes the legal obligations of a purchaser by signing the contract (as is suggested by the definition of "sale" found at 24 C.F.R. § 1710.1(n)), the question remains whether a *violation* can occur only at the time of a "sale."

As indicated above in Part II, the framers of Section 1703(a)(2) chose not to use the language of S.E.C. Rule 10b–5, on which the section is otherwise largely modelled ("in connection with the sale") nor was it framed (as were Sections 1703(a)(1) and 1709(a) and (b)) so as to make it unlawful "to sell or lease" by various prohibited means. Rather, the defendants are prohibited from engaging in the prohibited acts *"in selling or leasing."* Although it is impossible to make much of this difference in language standing alone, the distinction suggests that interpretations of a "sale" in the context of the 10b–5 "in connection with" requirement are not necessarily controlling in the interpretation of § 1703(a)(2). Moreover, the nature of the prohibited acts implies that the reach of § 1703(a)(2) goes beyond events occurring only up to or at the signing of land sales contracts. Section 1703(a)(2)(B) makes it unlawful, "in selling or leasing . . . to obtain money or property" through misrepresenting information in the official reports, or other pertinent information. Under a conditional land sales the seller is "obtaining money" throughout the course of the contract, until

**7.** We do not reach plaintiff's claim that previously filed proposed class actions, of which classes she would have been a member had the cases not been dismissed or the motions to certify classes denied, toll the limitations period as to her suit under the doctrine of *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974).

the land is fully paid for and title delivered; if the contract were signed and monies paid on account of prohibited misrepresentations, arguably the period in which "violations" occur extends throughout the life of the contract. See *Happy Investment Group v. Lakeworld Properties, Inc., supra,* 396 F.Supp. at 188. But see *Davis v. Rio Rancho Estates,* 401 F.Supp. 1045 (S.D.N.Y. 1975).

In this case, Ms. Husted claims that misrepresentations were made to herself and members of the class after their contracts had been signed for the purpose of inducing continued payments and additional purchases. Such behavior is surely within the reach at least of § 1703(a)(2)(B), which makes it unlawful "in selling or leasing . . . to obtain money or property" by means of misrepresentations on which the purchaser relies. In light of the language of this subparagraph (B) of § 1703(a)(2), the remedial purpose of the entire Act, and the common practice of selling undeveloped land by conditional sales contracts in which the seller retains a substantial incentive to induce continued payments, it is reasonable to apply the same construction to the general anti-fraud prohibitions of §§ 1703(a)(2)(A) and (C), at least where the defendants are accused of specific, additional wrongdoing after the contract is signed. Thus, we conclude that misrepresentations or fraudulent or deceitful behavior occurring after a conditional land sales contract is signed, for the purpose of inducing continued payment by the buyer to the seller, may be actionable violations of § 1703(a)(2) so long as suit is brought within two years of the conduct complained of and within three years of the "sale" or initial signing of the contract.

This ruling appears to be one of first impression. Several district courts have held that in suits to void contracts for violations of § 1703(a)(1) or (b)—that is, for failure to provide the property report to the purchaser "in advance of the signing" of any land sales contract—the two year limitations period of § 1711 is applicable. *Hall v. Bryce's Mountain Resort, Inc.,* 379 F.Supp. 165 (W.D.Va.1974); *Jacobsen v. Woodmoor Corp.,* 400 F.Supp. 1 (W.D.Mo. 1975); *Hester v. Hidden Valley Lakes, Inc., supra,* 404 F.Supp. 580. Since a violation of § 1703(b) can occur only at or before the time of signing, these cases have no bearing on whether violations of the distinct provisions of § 1703(a)(2) may occur after the sale. Nor are there decisions precisely on point in cases involving alleged violations of § 1703(a)(2). In *Melhorn v. Amrep, supra,* the court noted that the parties *assumed* that the two-year limitations period commenced to run at the date of sale. Therefore, the only issue presented or decided was whether the equitable estoppel doctrine barred the defendants from raising the statute of limitations defense. 373 F.Supp. at 1379, note 7. *Davis v. Rio Rancho Estates, supra,* 401 F.Supp. 1045, held that where a conditional land sales contract was signed in 1968, five months prior to the effective date of the ILSFDA, a suit brought in 1975 under the Act failed to state a claim upon which relief could be granted. The Act's statute of limitations was not considered, the holding being simply that the Act was not retroactive. The court did reject plaintiffs' argument that the underlying transaction was actionable under the Act since the "sale" was not complete until all payments had been made and legal title to the land delivered; however, plaintiff had made no allegations of continuing or additional misrepresentations such as are made here. In *Happy Investment Group v. Lakeworld Properties, supra,* on the other hand, the court suggested without deciding that violations of the Act might be actionable through the duration of a conditional land sales contract.

Our construction of the statute finds support in decisions relating to the sale of securities. Thus, in *United States v. Kormel, Inc.,* 230 F.Supp. 275 (D.Nev.1964) the court found that representations made to investors to induce them to continue payments under an existing stock subscription were made in the "offer or sale" of securities within the meaning of the Securities Act of 1933, §§ 17, 20(b), 15 U.S.C. §§ 77q, 77t(b), because the sale was not complete

until the whole purchase price was paid and the shares delivered. Accord, *S.E.C. v. North American Finance Co.,* 214 Supp. 197 (D.Ariz.1959); *United States v. Robertson,* 181 F.Supp. 158 (S.D.N.Y.1959). The two cases relied on by defendants to refute this proposition are inapposite. In *Schiller v. The Slick Corp.,* CCH Sec.Rptr. ¶ 90.065 (Transfer Binder 1974–75) (S.D.N.Y.1975) the court construed the "in connection with" language of Rule 10b–5—which language is not incorporated in § 1703(a)(2)— to mean that a sale had occurred when the purchaser signed the sales contract. It held that no cause of action arose under Rule 10b–5 for misrepresentations allegedly made after plaintiff signed the contract, but before the closing, since such misrepresentations would be mere inducements to performance. Section 1703(a)(2)(B), by contrast to Rule 10b–5, appears to prohibit certain inducements to performance, i. e. "obtaining money" by means of misrepresentations. And *Morales v. Reading & Bates Offshore Drilling Co.,* 392 F.Supp. 41 (N.D.Okl.1975) held that for purposes of § 16 of the Securities Exchange Act of 1934, 15 U.S.C. § 78p, prohibiting insider profits on shortswing sales, a "sale" occurs whenever the insider's liabilities have become definite, even if in ordinary commercial parlance the sale did not occur for sometime afterwards. This construction was based on the remedial purpose of § 16, as our interpretation of the word "violation" is based on the remedial purpose of § 1703.

Accordingly, defendants' motion to dismiss Count I of the complaint as barred by the statute of limitations is denied. Paragraph 32 pleads continuing affirmative acts by the defendant after the initial sales contract was entered into which, if proven at trial, could either toll the running of the two year limitations period or establish a violation of § 1703 within two years of the filing of the complaint.

2. *Count II* : Defendants also claim that Count II, alleging violations of §§ 1709(a) and (b)(2) is barred by the *one* year statute of limitations, which runs from

the time when the omissions or misrepresentations were or should have been discovered. They argue that as a matter of law, the New York Offering Statement supplied to Ms. Husted in addition to the federally required documents disclosed facts sufficiently adverse so that exercising due diligence she should have been able to discover the alleged misrepresentations and omissions within one year of having received the offering statement in January of 1973. However, it cannot be said as a matter of law that the New York document triggered the one year limitations period. For example, nothing is known of the circumstances under which the New York Offering Statement was given to the plaintiff, or other facts which might be significant in light of allegations in the indictment and in this complaint that the defendants attempted to prevent purchasers from reading relevant official documents. (¶ 29, Complaint; ¶ 18(g)(xx), Indictment) Nor is it at all clear how conditions in fact deviated from those described in these statements. These are factual questions which clearly can only be decided at trial. It would, moreover, be inconsistent with the remedial purposes of the ILSFDA to extinguish this claim summarily on a statute of limitations ground at the pleading stage and without discovery. "Limitations issues ordinarily require factual determinations and are best left to trial." *Tomera v. Galt, supra,* 511 F.2d at 510–11; *Jones v. Rogers Memorial Hospital,* 143 U.S. App.D.C. 51, 442 F.2d 773 (1971). Cf. *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir. 1968) (*en banc*), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

*B. Compliance With Rule 9(b)*

Defendants claim that the complaint fails in three respects to comply with the requirement of Rule 9(b) that "in all averments of fraud the circumstances constituting the fraud . . . shall be stated with particularity,": it fails to identify the precise documents, statements and omissions complained of; it fails to specify the nature of each defendant's complicity; and it fails to set forth a basis for pleading on

information and belief the claims in Count II (pertaining to misrepresentations and omissions in the statement of record and property report).

■ The fraudulent .scheme alleged in Counts I and III (the common law fraud count) are pleaded with sufficient particularity under Rule 9(b). Paragraphs 17–33 describe specifically the nature of the fraudulent scheme complained of, and the devices allegedly used to pressure and defraud the purchaser in acquiring land in Rio Rancho Estates.[8] These allegations more than meet the requirements of Rule 9(b). The wrongdoing complained of extended over a period of years and is conceded to have been accomplished (if at all) through numerous documents, and other advertising material and techniques. Specification of each is unnecessary. "Such prolixity is not compelled—indeed is discouraged—by the Federal Rules of Civil Procedure." *duPont v. Wyly,* 61 F.R.D. 615, 631 (D.Del.1973), cited with approval, *B & B Investment Club v. Kleinert's Inc.,* 391 F.Supp. 720, 727 (E.D. Pa.1975). Plaintiff has identified the category of documents and other material complained of, and "the nature of the information which [s]he claims these documents

either omit or misrepresent." *duPont v. Wyly, supra,* 61 F.R.D. at 632. That is all that is required under Rule 9(b). The facts alleged in the complaint and in the indictment of these defendants assure that there is some basis in fact for the charges made. Cf. *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir. 1972); *Selzer v. Bank of Bermuda Ltd.,* 385 F.Supp. 415, 419 (S.D.N.Y.1974).

■ As to Count II, it is doubtful that Rule 9(b) even applies. Section 1709(a) is modelled on § 11 of the Securities Act of 1933, 15 U.S.C. § 77*l*. Intent to deceive or defraud is not an element of suit under § 11, nor does it appear to be an element here. Nor need plaintiff prove reliance to recover for violations of § 1709(a). In short, § 1709(a) does not involve fraud or fraud-like behavior. Judge Metzner has held that the requirements of Rule 9(b) do not apply to claims under § 11 of the Securities Act, and his reasoning appears applicable to claims under § 1709(a) as well. *Schoenfeld v. Grant Stores Corp.,* 62 F.R.D. 348, 350 (S.D.N.Y.1974). Similarly, claims under § 1709(b)(2) may be based simply on a showing that a lot was sold "by means of a property report which contained an untrue statement of a material fact or omitted

---

8. These paragraphs allege that after purchasing and subdividing the land in Rio Rancho Estates, the defendants "entered into a scheme and plan for selling interests to the public in Rio Rancho Estates. Such scheme took the form of a carefully planned and elaborate high pressure sales campaign which included the use of untrue statements of material fact and the knowing omission to state material fact in, among other things, statements of record filed with the Secretary and property reports [¶ 19] . . . defendants designed and devised their overall sales campaign in order to induce the members of the class to purchase lots in Rio Rancho Estates primarily based on the alleged value of the lots as sound financial investments and ideal homesites and the assured development of Rio Rancho Estates as a planned and fully developed community [¶ 24] . . . In furtherance of its sales promotion campaign defendants made the following material misrepresentations in defendants' reports filed with various state and federal agencies, in written and filmed promotional material and trained agents to include the representations in the standard sales promotions made to the public:

(a) that said property was a good investment;
(b) that said property would rapidly appreciate in value;
(c) that said property could be easily resold at a profit;

\* \* \* \* \* \*

(f) that Rio Rancho Estates would be absorbed and become a part of the City of Albuquerque . . .
(g) that, among other things, there was ample available water, utilities and other customary amenities to the lots sold . . ." (¶ 26)

Paragraph 27 charges defendants with a series of culpable omissions of material facts, and paragraph 29 charges the defendants with attempting to discourage prospective purchasers from reading the property reports before signing. Paragraph 30 makes specific charges concerning inadequacies in the official reports. Paragraph 33 alleges that plaintiff and members of her class were induced by defendants' conduct to purchase lots in Rio Rancho Estates.

to state a material fact required to be stated therein." Intent to deceive or defraud is not required.

Moreover, even if Rule 9(b) did apply to such suits, its requirements are met by the allegations of Paragraph 30.

■ The involvement of each defendant is sufficiently pleaded. The role of each of the corporate defendants in the alleged scheme of misconduct has been briefly indicated, and each of the individual defendants is identified as an officer and/or director of one or more of the corporate defendants. The Court of Appeals for the Tenth Circuit has held that such individuals may be liable as "developers" (or as aiders and abettors) even though there is no "controlling person" provision in this statute. *McCown v. Heidler,* 527 F.2d 204, 207 (10th Cir. 1975). At this stage of the proceedings, before discovery has occurred, it would be unduly burdensome to impose a requirement of more detailed pleadings than have been made.

■ However, defendants are correct that only the "developer" and not the developer's "agents" are liable under § 1709(a). Accordingly, it will be appropriate to dismiss the § 1709(a) claims against those defendants sued only as agents of the developer.

■ Defendants' suggestion that while the indictment and the FTC complaint provide a sufficient basis for alleging violations of § 1709(b)(1) [§ 1703] on information and belief, they do not provide any basis for alleging on information and belief the violations of §§ 1709(a) and (b)(2) is without merit. Since Rule 9(b) does not apply to these claims, no special basis in fact for pleading on information and belief is required. Moreover, the original indictment itself belies defendants' claim that it made no accusations of misinformation or omissions in the property reports or statements

of record.[9] Finally, a plaintiff is entitled to rely on the allegations of a scheme of fraud set forth in an indictment and, by comparing what the grand jury charged were the true facts with those provided in selling documents, plead on information and belief misrepresentations or omissions in those documents.

## C. Failure to State a Claim Upon Which Relief Can Be Granted—Count II

■ Defendants argue first that the ILSFDA requires only that the statement of record and property report contain such information as the Secretary requires and that therefore the Secretary's acceptance of the statement of record, and his failure to request additional information in the property report, mean that the Secretary made a determination which should be conclusive here that all necessary material information had been stated. The argument is without merit, since both the Act itself and regulations in effect prior to any of plaintiff's purchases provide that the Secretary's acceptance of a statement of record or property report does not indicate his approval of its contents or a finding that it contained all material required. 15 U.S.C. § 1716; 24 C.F.R. § 1710.105(b) (promulgated and effective December 22, 1971, 36 Fed.Reg. 24739); 24 C.F.R. § 1710.32 (1973) (promulgated and effective January 27, 1972, 37 Fed.Reg. 1303).

■ Second, defendants argue that neither the statute nor the regulations require the statement of record or property report to supply all material and relevant information to the purchaser, but only the specific categories of information required either by statute or rule. We are inclined to agree with defendants' interpretation in light of the framer's failure to adopt in full the language of § 12 of the Securities Act of 1933, forbidding use of a prospectus "which

---

9. See ¶ 18(g)(xxi) of the Original Indictment, 75 Cr. 1023. Defendants argued that since the superseding indictment filed in this case eliminated this allegation, "there is no claim under § 1709(b)(2)," letter of July 14, 1976 to the court concerning *Bryan v. Amrep Corp.,* 75 Civ. 5911 from Jacobs, Persinger & Parker. That the original indictment charged inadequacies in the property report, however, would seem to be sufficient to establish probable cause for pleading this claim on information and belief.

includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading . . ." Instead, §§ 1709(a) and (b)(2) create liability for use of a statement of record or property report which "contained an untrue statement of a material fact or omitted to state a material fact *required to be stated therein* . . ." Although by regulation the general language of § 12 quoted above has been added to the requirements for information to be included in the statement of record, 24 C.F.R. § 1710.105(b), a similar rule is not in effect for property reports. The statute consistently replaces the "all material facts" language of the securities acts with references to what the Secretary requires. But see Statement of Senator Williams, 118 *Cong.Rec.* 15272 (Sen.) (May 28, 1968). However, this is not the end of the matter.

Defendants urge that this view compels the conclusion that they were not required to provide any information in the property report or statement of record concerning special investment risks, or the value of the land when purchased by them, since information of that category was not at the time required to be included either by statute or regulation. Were Ms. Husted relying exclusively on *these* claimed omissions as the basis for her claim in Count II, more careful consideration would have to be given to the defendant's contention that these omissions are simply not actionable. Such consideration is not warranted at this stage, however, since plaintiff makes other claims of omissions and misrepresentations in Count II, specifically, those pertaining to the availability of water and other utilities, which clearly survive a motion to dismiss.

Defendants were required both by statute and regulation to report fully on the availability of water and other utilities. 15 U.S.C. § 1705; 24 C.F.R. § 1710. A comparison of the charges made in the indictment concerning the water and utility situation and of the charged misrepresentations and omissions from the statement of record and property report makes clear that plaintiff has stated a claim for relief on Count II. Although the property report and statement of record, as defendants point out, do disclose that utilities are presently extended only to lots in Units 11 and 16, and that there were no legal assurances that water would be extended to all lots, both the statement of record and the property report also stated that the water company was "an affiliate of the developer" and suggested that it would in fact extend water in timely fashion to all homesites. The indictment charged, however, that the extension policies of the utility company in fact precluded the overwhelming majority of purchasers from obtaining utilities for their lots. Count 18(*o* )(ix). Moreover, the statement of record indicated that individual property owners could build their own septic tanks on their lots, whereas the indictment charged that under New Mexico law such construction was not permitted on less than a ¾ acre lot and that most of the lots sold for residential use were one-half acre lots. If the grand jury charges are true, then plaintiff may well have a meritorious claim in Count II under §§ 1709(a) or (b)(2). See *United States v. Goldberg & Pocono International,* 527 F.2d 165, 171–73 (2d Cir. 1976); *Paquin v. Four Seasons of Tennessee, Inc.,* 519 F.2d 1105, 1111–12 (5th Cir. 1974) (Clarke J., dissenting).

In light of the determinations above, defendants' contention that there is no pendent jurisdiction of the common law fraud claims and that the complaint should be stricken under Rule 11 are without merit.

The motion to dismiss the complaint is accordingly denied.

It is so ordered.