STATE of Alaska, Appellant,

v.

FIRST NATIONAL BANK OF ANCHORAGE, Appellee.

George H. BROWN, Jr., Lawrence Brouse, John Dryer and Commonwealth Mortgage Corporation, Appellants, Cross-Appellees,

v.

STATE of Alaska, Appellee, Cross-Appellant.

Nos. 5006, 5107.

Supreme Court of Alaska.

Dec. 3, 1982.

Michele D. Brown, Donna Dell'Olio, Connie J. Sipe, Asst. Attys. Gen., Anchorage, Avrum M. Gross and Wilson L. Condon, Attys. Gen., Juneau, for appellant, State of Alaska.

John R. Beard, Beard & Lawer, Anchorage, for appellee, First Nat. Bank.

Terry C. Aglietti, John W. Sivertsen, Aglietti, Offret & Pennington, Anchorage, for appellants, George H. Brown, Jr., Lawrence Brouse, John Dryer, and Commonwealth Mortgage Corp.

Before RABINOWITZ, C.J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

These appeals arise from an action brought by the Attorney General against George Brown, Jr. and others[1] involved in the development and sale of certain real property in this state. The basic conduct complained of consists of various misleading statements and omissions concerning the suitability of the land for residential construction. The State sought to enjoin such conduct and to obtain restitution on behalf of individual lot purchasers. After obtaining a preliminary injunction, the State joined as an additional defendant First National Bank of Anchorage, which had financed the real estate development, seeking cancellation of purchasers' promissory notes which the Bank was holding as collateral for its loans to Brown. The lower court dismissed the State's action against First National and, after a non-jury trial, entered judgment against Brown. That judgment permanently enjoined Brown from engaging in certain conduct and adjudged him liable to the State, as trustee for individual purchasers, for $1,611,357.60.[2] Brown has appealed that judgment and the State has filed a cross-appeal. The State has also appealed the trial court's dismissal of its claim against First National.

## I. BACKGROUND

### A. Facts

The following facts were found by the court. They are not challenged on appeal and we therefore take them as true.

---

1. The others are: Neil Hausam, Brown's engineer; John Dryer, Brown's primary Windsong lot salesman; Lawrence Brouse, hired by Brown to manage the Windsong development project; Knik River Estates, a limited partnership of which Brown is the general partner; and Commonwealth Mortgage Corporation, formed by Brown after the State instituted this action and to which Brown subsequently transferred the promissory notes and deeds of trust executed by Windsong lot purchasers. For simplicity, these defendants will frequently be referred to collectively as "Brown."

2. Judgment was entered jointly and severally against Brown and Commonwealth Mortgage Corporation for the full amount. Dryer was held liable for only $50,000 and Brouse for $37,500. Hausam was dismissed as a defendant earlier in the case upon prevailing on a summary judgment motion and is not a party to these appeals. Knik River Estates is not mentioned in the trial court's final judgment.

George Brown, Jr. is the general partner of Knik River Estates, a limited partnership. In the summer of 1975, he began developing some property which lies adjacent to the Knik River in the Matanuska-Susitna Borough, known as the Windsong Subdivision. He knew at that time that the land had in the past been subject to flooding. The source of that flooding is Lake George, which periodically forms when the Knik River becomes dammed by a glacier. When the ice dam breaks, water is released flooding certain downstream areas, including on occasion the Windsong Subdivision, covering it with as much as fifteen feet of water.[3]

Brown hired Neil Hausam, a civil engineer and land surveyor, to survey and plat the land. Hausam studied the possibility of flooding and concluded that a reoccurrence was unlikely. Prior to approving the plat, the Matanuska-Susitna Borough requested that the Army Corps of Engineers conduct a flood-hazard evaluation of the Windsong Subdivision. The Corps concluded that virtually all of the subdivision was in a high-hazard area. Although Hausam disagreed with that conclusion and informed the Borough of this, the Borough required that the first page of the Windsong plat contain a flood-warning notation.

In 1976, Brown commenced selling lots. To assist him, he hired a salesman, John Dryer, and a property manager, Lawrence Brouse. Although purchasers were given the second page of the Windsong plat, they never received the first page containing the flood warning. In addition, Brown represented to purchasers, among other things, that: (1) Lake George had not formed since the Good Friday earthquake of 1964; (2) it would take another earthquake of equal magnitude for the lake to form again; (3) experts, including the Army Corps of Engineers, had concluded that the possibility of flooding was remote; (4) purchasers of Windsong lots would be able to obtain flood and mortgage insurance; and (5) construction financing was readily available. None of these representations were true.

In December 1977, the Consumer Protection Section of the Attorney General's Office began investigating the sale of Windsong lots. Upon learning of that investigation, Brown sent all purchasers a letter telling them that certain unfounded complaints were being directed at the Windsong development. The purpose of that letter was to make purchasers feel secure about their investments and continue making their property payments. In late January of 1978, a meeting was held at which Brown, Brouse, Hausam and various representatives of the Attorney General's Office were present. At that meeting Brown was told that the State had received several consumer complaints regarding the sale of Windsong lots. He was also shown letters that the State had received from various experts indicating the existence of a flood hazard at the Windsong Subdivision.

Immediately following this meeting, Brown contacted between sixty and seventy lot purchasers and induced them to sign a preprinted form affidavit entitled "Declaration and Memorandum of Understanding." This was drafted by Brown's attorneys for the purpose of lining up favorable witnesses in case of future litigation. At the time the document was presented to purchasers, Brown reassured them that the possibility of flooding was still remote and that property values had increased. Signing purchasers were not given a meaningful opportunity to study the document, and the language contained therein was not comprehensible to the average purchaser. In effect, the affidavits purported to be a vote of confidence by investors in the Windsong development. Those purchasers whom Brown knew to be dissatisfied with their investments were not offered the memorandum.

B. Proceedings Below

In February 1978, the State filed a complaint in superior court against Brown seeking injunctive relief and civil penalties. The State alleged various violations of the

___

**3.** The most recent occurrence of such flooding appears to have been in 1966.

Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471–45.50.561. Brown filed his answer and later moved for summary judgment on the ground that the Consumer Protection Act did not apply to real estate transactions, or in the alternative that he was exempt from the Act under AS 45.50.481.[4] The trial court granted Brown's summary judgment motion, but gave the State leave to amend its complaint.

In June 1978, the State filed its amended complaint, this time alleging that Brown had violated the Uniform Land Sales Practices Act ("ULSPA"), AS 34.55.004–34.55.046. Shortly thereafter, the State moved for a preliminary injunction to enjoin Brown from disposing of Windsong lots in violation of ULSPA and the administrative regulations promulgated thereunder, 3 AAC 20.010–.130. After a lengthy hearing, the lower court entered a preliminary injunction against Brown ordering him to disclose fully to prospective purchasers the Windsong Subdivision's flooding potential, and enjoining him from disposing of land in violation of ULSPA and its implementing regulations. Brown was also enjoined from taking any adverse action against lot purchasers who, after being notified by the State of the court's preliminary findings, elected to rescind their land purchase contracts. Such purchasers were directed to make all future payments to the court registry. Approximately seventy purchasers indicated that they wished to rescind their contracts and obtain restitution.

In December 1978, the State amended its complaint again to add First National Bank of Anchorage as a defendant. The Bank's involvement in this case stems from loans it made to Brown to finance the Windsong development. In 1977, First National loaned $200,000 to Knik River Estates to purchase materials for constructing a sewer system in the Windsong Subdivision. In accordance with its collateral and loan agreement, Knik River Estates pledged to the Bank the promissory notes and deeds of trust executed by lot purchasers. When, in the early part of 1978, Brown formed Commonwealth Mortgage Corporation to assume ownership of the Windsong Subdivision, Commonwealth continued to pledge to the Bank the promissory notes and deeds of trust received from the sale of Windsong lots. In August 1978, First National loaned Commonwealth $500,000 to retire the balance of the earlier loan and to install electric and telephone utilities at Windsong.

The 1977 and 1978 loan agreements were substantially identical. Neither involved actual endorsement of the promissory notes that had been pledged as security and delivered to First National. Instead, the loan agreements authorized the Bank to endorse the notes to itself on behalf of the borrower. In late November of 1978, First National endorsed over to itself all of the promissory notes in its possession. It then sent collection letters to all Windsong lot purchasers who were delinquent in their payments. First National informed these purchasers that unless all delinquent payments were paid within fifteen days, the entire balance would become due immediately. The Bank also told these purchasers that their payments to the court registry, pursuant to the preliminary injunction, would not be credited toward the amounts claimed due.

---

4. That section provides:

Nothing in AS 45.50.471–45.50.561 applies to

(1) an act or transaction regulated under laws administered by the state, by any regulatory board or commission or officer acting under statutory authority of the state or of the United States, unless the law regulating the act or transaction does not prohibit the practices declared unlawful in AS 45.50.471;

. . .

Brown argued that he was exempt under this section because the transactions at issue were regulated under the Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701–1720, which, Brown claimed, prohibits the practices alleged by the State in this case to violate AS 45.50.471. Although Brown had obtained an exemption from the registration provisions of the federal act, the trial court agreed that Brown was exempt from the Consumer Protection Act and granted summary judgment to Brown on that basis. Later in the case, however, the trial court concluded that the Consumer Protection Act did not apply to real property transactions. See Part II of this opinion, infra.

In its complaint against the Bank the State sought a declaratory judgment that First National was not a "holder in due course" as well as an order enjoining the Bank from taking action against purchasers who were making their note payments to the court registry. The State later moved for summary judgment against First National, requesting that the court order the Bank to deliver to the court the promissory notes of purchasers who had elected to rescind their land purchase contracts. First National responded by moving for dismissal of the State's complaint against it for failure to state a claim. The lower court ultimately granted First National's motion, concluding that the Attorney General lacked standing to maintain an action against the Bank.

Trial of the case commenced on March 16, 1979. On the first day, the lower court orally granted summary judgment against the State in favor of Hausam, Brown's engineer. The basis for the court's ruling was that AS 34.55.006,[5] the general antifraud section of ULSPA, could not be applied retroactively and Hausam had done nothing to affect land sales at Windsong after the effective date of that section, September 21, 1977.[6] Immediately following that ruling, in response to a question by Brown's counsel, the trial court stated:

> Well, I guess, implicit in what the court has already ruled with regard to Mr. Hausam is that any claim based upon anyone who relied—whose actions were motivated by acts that took place prior to the effective date of the amendment must fail.

Counsel for the State interjected stating that it was the State's position that "lulling conduct" by Brown which occurred after the effective date of the ULSPA amendments could supply the basis for granting restitution to purchasers who bought lots before the amendment's effective date. The court reserved ruling on that question and allowed the case to proceed.

On October 25, 1979, the trial court entered its final judgment in the matter. That judgment permanently enjoined Brown from disposing of Windsong lots without first obtaining a purchaser's signature on a document, drafted by the court, fully disclosing the flood risk at Windsong. It also enjoined Brown from making any statements inconsistent with those contained in that document. In addition, Brown was enjoined from engaging in certain acts and practices prohibited by the administrative regulations implementing ULSPA. With respect to the State's claim for restitution, the trial court entered judgment against Brown in favor of the State, as trustee for those purchasers who had elected to rescind, for $1,611,357.60. The basis for this award, however, was not ULSPA, upon which the State had predicated its case and upon which Brown had defended. Instead, the lower court *sua sponte* ordered restitution on the basis of common law fraud, and specifically declined to rule on the applicability of ULSPA. In all, the court's judgment listed seventy-one purchasers who were eligible for restitution, eighteen of whom had bought lots after and fifty-three of whom had bought lots before September 21, 1977, the effective date of the ULSPA amendments. Finally, the lower court awarded the State attorney's fees and costs of $42,000 and $1,894.24, respectively.

---

**5.** AS 34.55.006 provides:

It is unlawful for a person, in connection with the offer, sale or purchase of subdivided land directly or indirectly, to knowingly

(1) employ a device, scheme, or artifice to defraud;

(2) make an untrue statement of a material fact or omit a statement of a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(3) engage in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

**6.** As originally enacted, ULSPA applied only to sales of subdivided land located outside the state. *See* Ch. 179, SLA 1968. In 1977, the legislature amended ULSPA to bring in-state land sales within its scope. *See* Ch. 138, SLA 1977. As part of the same bill, the legislature added AS 34.55.006. The effective date of these changes was September 21, 1977. *Id.*

**412**

### C. Contentions on Appeal

On appeal, Brown contends that the trial court erred in ordering restitution to Windsong lot purchasers on the basis of common law fraud. Brown asserts that the State is without authority to pursue the common law rights of defrauded land purchasers. In essence, Brown claims that the trial court was bound to apply ULSPA, under which the lower court's restitution order would not have been proper since, Brown asserts, ULSPA cannot be retroactively applied. Brown also contends that application of ULSPA to in-state subdividers is unconstitutional, and that the administrative regulations promulgated under ULSPA are invalid as applied to him. Finally, Brown claims that the lower court erred in refusing his request for a jury trial.

The State, on the other hand, argues that the trial court did not err in granting relief on the basis of common law fraud. The State also contends that the trial court's judgment would have been proper under ULSPA, and under the Consumer Protection Act as well. The State does, however, claim that the trial court erred in dismissing its claim against First National Bank of Anchorage. The State also contends that the trial court erred when, shortly following the issuance of the preliminary injunction, it denied the State's request for prejudgment attachment of certain property belonging to Brown.

### II. APPLICATION OF THE CONSUMER PROTECTION ACT TO SALES OF REAL PROPERTY

■ We begin by addressing the State's contention that the trial court's judgment can be affirmed under the Unfair Trade Practices and Consumer Protection Act, AS 45.50.471–45.50.561. We address this argument first because, as the State points out, AS 45.50.501 specifically authorizes the Attorney General to bring suit to enjoin violations of the Act, and expressly empowers the court in such cases to award restitutory relief.[7] As noted earlier, the State's original complaint alleged that Brown's Windsong activities violated the Consumer Protection Act. The lower court dismissed that complaint on the basis of the exemption contained in AS 45.50.481(1).[8] Later, however, in rendering its final decision, the court held that the Act does not apply at all to the sale of real property, a conclusion which the State claims is erroneous. For the reasons discussed below, we agree with the lower court's decision.

AS 45.50.471(a) provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.

Standing alone, this language could be construed as prohibiting misrepresentations made by sellers of real property. Added by way of amendment to the Act in 1974, *see* Ch. 53, § 1, SLA 1974, subsection (a) was intended "to make the prohibitory language . . . of the present Act more responsive to the needs of the Alaskan consuming public and the business community."[9] And, because the Act is remedial, we are mindful that its provisions are to be liberally construed. *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980).

■ Nevertheless, we are persuaded that the entire thrust of the Consumer Protection Act is directed at regulating practices relating to transactions involving consumer goods and services. Immediately following AS 45.50.471(a) is a list of twenty-five spe-

---

**7.** AS 45.50.501 provides in relevant part:

(a) When the attorney general has reason to believe that a person has used, is using, or is about to use an act or practice declared unlawful in AS 45.50.471, and that proceedings would be in the public interest, he may bring an action in the name of the state against the person to restrain by injunction the use of the act or practice. . . .

(b) The court may make additional orders or judgments that are necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of an act or practice declared to be unlawful by AS 45.50.471.

**8.** *See* note 4 *supra.*

**9.** Governor's Transmittal Letter, 1974 House Journal 122.

cific acts or practices which are expressly prohibited as "unfair methods of competition" and "deceptive acts or practices." AS 45.50.471(b). Of these, .thirteen concern practices relating to transactions involving "goods" or "goods and services" generally.[10] The remaining twelve deal with practices involving the sale of particular types of goods [11] or services,[12] or relate to certain types of activities commonly associated with consumer goods and services transactions.[13] While subsection (b) makes clear that this list is not exclusive, none of the enumerated prohibited acts mentions real property. Nor do any other provisions of the Act suggest that the legislature intended the sale of real property to come within the Act's purview.[14]

■ It is our judgment that the trial court properly invoked the rule of *ejusdem generis* to construe the language of AS 45.50.471(a). "[W]hen particular words are followed by general terms, the latter will be regarded as referring to things of a like class with those particularly described." *Chugach Electric Ass'n v. Calais Co.,* 410 P.2d 508, 509–10 (Alaska 1966). The doctrine is equally applicable when, as here, specific words comprehending a class of activity follow a more general description. 2A C. Sands, Sutherland Statutory Construction § 47.17, at 103 (4th ed. 1973). In

our view, real property falls outside of the class "particularly described," i.e., "goods and services." The list of proscribed activities found in AS 45.50.471(b) suggests that the Act is directed solely at regulating transactions involving "products and services sold to consumers in the popular sense." *Neveroski v. Blair,* 141 N.J.Super. 365, 358 A.2d 473, 480 (N.J.1976). In *Neveroski,* the court was called upon to construe the word "merchandise," which was defined in the New Jersey Consumer Fraud Act to include "anything offered, directly or indirectly, to the public for sale." *Id.* 358 A.2d at 479. Because that language was preceded by the words "objects, wares, goods, commodities, [and] services," the court invoked the doctrine of *ejusdem generis* to hold that misrepresentation by a real estate broker in connection with the sale of real property was not actionable under the New Jersey Act. *Id.* 358 A.2d at 479–81. The broad language of AS 45.50.471(a), like that involved in *Neveroski,* "can logically be attributed to a legislative desire to incorporate other consumer transactions" which may not be regulated by the specific prohibitions found in subsection (b). *Neveroski,* 358 A.2d at 480.

This construction of subsection (a) also finds support in other provisions of the Act. AS 45.50.561(6) defines a "consumer" as "a

---

10. *See* AS 45.50.471(b)(1), (2), (3), (4), (5), (6), (7), (8), (9), (11), (13) and (19).

11. AS 45.50.471(b)(18) (resetting vehicle odometers); (21) (selling frozen meat as "fresh"); (25) (failure to comply with AS 45.50.800–45.-50.850, the Alaska Gasoline Products Leasing Act).

12. AS 45.50.471(b)(17) (excess charges for warranty repairs); (23) (failure to comply with AS 45.45.130–45.45.240, regulating motor vehicle repairs); (24) (prohibiting certain practices in connection with counseling, consulting or arranging for future services relating to the disposition of a body upon death).

13. AS 45.50.471(b)(10) (misrepresentations regarding price reductions); (14) (misrepresenting legal rights or obligations in an agreement); (15) (misrepresenting the need for parts, replacement or repair service); (16) (misrepresenting the authority of an agent or representative to negotiate the terms of a consumer transaction); (20) (selling or offering to sell a right

of participation in a chain distributor scheme); (22) (failure to comply with AS 45.02.350, regulating the sale of goods or services by door-to-door solicitation).

14. In this respect, Alaska's Act differs from the Acts of several states, cases from which have held that real property transactions are within the Act's scope. *See, e.g. Nash v. Hoopes,* 332 A.2d 411, 413 (Del.Super.1975) (Act prohibiting deceptive merchandising practices where "merchandise" statutorily defined to include real proeprty); *Commonwealth v. DeCotis,* 366 Mass. 234, 316 N.E.2d 748, 752 (Mass.1974) ("trade or commerce" statutorily defined to include the sale of real property); *Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812, 820 (Pa.1974) ("trade or commerce" statutorily defined to include the sale of real property); *Woods v. Littleton,* 554 S.W.2d 662, 667 n. 9 (Tex.1977) ("consumers" statutorily defined to include purchasers of real property).

person who seeks or acquires *goods or services* by lease or purchase." (Emphasis added). Moreover, AS 45.50.531(a) grants a private right of action only to "[a] person who purchases or leases *goods or services* and thereby suffers an ascertainable loss ... as a result of another person's act or practice declared unlawful by AS 45.50.471.-" (Emphasis added). That the section authorizing the Attorney General to sue to enjoin violations of AS 45.50.471 contains no comparable limitation, see AS 45.50.501, does not, in our opinion, indicate that the scope of the Act enlarges when suit is instituted by the State.

In sum, we hold that the sale of real property is not within the regulatory scope of the Consumer Protection Act. Accordingly, Brown's liability for restitution to Windsong lot purchasers could not properly be predicated on asserted violations of that Act.

## III. THE UNIFORM LAND SALES PRACTICES ACT

After the trial court dismissed the Consumer Protection Act claim against Brown, the State amended its complaint to allege violations of the Uniform Land Sales Practices Act (ULSPA), AS 34.55.004–34.55.046. Throughout the remainder of the proceedings, the State consistently asserted and Brown consistently denied liability under this Act. At the conclusion of the case, the lower court declined to rule on the applicability of ULSPA, relying instead on the common law. The State contends that the judgment would have been proper under ULSPA. Brown, on the other hand, maintains that ULSPA cannot constitutionally apply to him since the 1977 amendments, which made the Act applicable to in-state land sales, were enacted in violation of article II, section 13 of the Alaska Constitution. Brown also claims that a court is without authority to award restitution in a suit brought under ULSPA by the Attorney

General. Finally, Brown argues that even if the court could award restitution, it could not do so as to those purchasers who bought their lots prior to the effective date of the ULSPA amendments.

### A. The Constitutional Validity of the ULSPA Amendments.

Article II, section 13 of the Alaska Constitution [15] requires that every bill be confined to one subject which must be expressed in its title. The 1977 amendments to ULSPA find their genesis in House Bill 67, entitled "An Act Relating to the Uniform Land Sales Practices Act." 1977 House Journal 63. The bill was introduced at the Governor's request and all of its provisions related directly to ULSPA. See Governor's Transmittal Letter, *id.* at 63–66. The primary impact of House Bill 67 was to amend ULSPA to bring in-state sales of subdivided land within the Act's scope and to add a general antifraud section. With only minor changes, the bill received the House's approval and was sent to the Senate for its consideration. At the instance of the Senate Rules Committee, a Senate Committee Substitute was approved. 1977 Senate Journal 1517. This version of the bill was entitled "An Act Relating to Land; And Providing for an Effective Date." *Id.* at 1489. The sections relating to ULSPA were essentially the same as those approved by the House, but the Senate Committee Substitute also contained various amendments to the Alaska Land Act, AS 38.05.-005–38.05.370. These amendments pertain to the leasing of state-owned lands and to the Division of Lands' zoning power. It was this version of the bill that ultimately became law. Ch. 138, SLA 1977.

That every section of Chapter 138, SLA 1977 in some respect concerns land is not disputed. However, it is just as clear that many of its provisions have nothing else in common. Thus, the issue to be resolved is

---

**15.** Alaska Constitution, art. II, § 13 provides:
Every bill shall be confined to one subject unless it is an appropriation bill or one codifying, revising, or rearranging existing laws. Bills for appropriations shall be confined to appropriations. The subject of each bill shall be expressed in the title. The enacting clause shall be: "Be it enacted by the Legislature of the State of Alaska."

whether the general heading "land" can be considered "one subject" for purposes of article II, section 13. Were we writing on a clean slate, we would be inclined to find this subject impermissibly broad. Permitting such breadth under the one-subject rule could conceivably be misconstrued as a sanction for legislation embracing "the whole body of the law." *Trumble v. Trumble,* 37 Neb. 340, 55 N.W. 869, 870 (Neb. 1893). Nevertheless, while the issue is indeed close, we are unable to say that the legislature has transgressed the limits of article II, section 13 established by prior decisions of this court.

To determine if a bill is confined to one subject,

[a]ll that is necessary is that the act should embrace some one general subject; and by this is meant, merely, that all matters treated of should fall under some one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be part of, or germane to, one general subject.[16]

Thus, "what constitutes one subject for purposes of art. II, § 13 is broadly construed."[17] And "[n]o act will be set aside for failing to comply with this provision except where the violation is both substantial and plain."[18]

■ In *Gellert v. State,* 522 P.2d 1120 (Alaska 1974), we upheld a bill that provided for the issuance of bonds to finance flood control and small boat harbor projects. These two topics were found to be confined

to one subject because they both pertained "to one ongoing plan for the development of water resources." *Id.* at 523. More recently, in *North Slope Borough v. Sohio Petroleum Corp.,* 585 P.2d 534, 545 (Alaska 1978), we upheld "An Act Relating to Taxation; And Providing for an Effective Date." Because its various provisions, although diverse, all related to "state taxation," we found no violation of the one-subject rule. *Id.* at 544–46. In light of these decisions, we must likewise conclude that "land" is not an unduly broad subject for purposes of article II, section 13. Consequently, Chapter 138, SLA 1977, the provisions of which all relate to this subject, is constitutionally valid.[19]

### B. Restitution Under ULSPA in a Public Action.

■ Unlike the Consumer Protection Act, ULSPA does not expressly authorize the court to award restitutory relief in a suit instituted by the State. Although restitution is expressly available in a private action under ULSPA, AS 34.55.030(b), with respect to public enforcement, the Act merely provides that the State "may bring an action in the superior court . . . to enforce compliance with this chapter or a regulation or order under this chapter." AS 34.55.020(c). According to Brown, the absence of a provision authorizing restitution in a public action impliedly circumscribes the court's power to award such relief un-

---

**16.** *Gellert v. State,* 522 P.2d 1120, 1123 (Alaska 1974), *quoting Johnson v. Harrison,* 47 Minn. 575, 50 N.W. 923, 924 (Minn.1891). *See Short v. State,* 600 P.2d 20, 24 (Alaska 1979); *North Slope Borough v. Sohio Petroleum Corp.,* 585 P.2d 534, 545 (Alaska 1978).

**17.** *Short v. State,* 600 P.2d 20, 23 (Alaska 1979). *See North Slope Borough v. Sohio Petroleum Corp.,* 585 P.2d 534, 545 (Alaska 1978); *Gellert v. State,* 522 P.2d 1120, 1122 (Alaska 1974).

**18.** *North Slope Borough v. Sohio Petroleum Corp.,* 585 P.2d 534, 545 (Alaska 1978). *See Short v. State,* 600 P.2d 20, 23 (Alaska 1979); *Suber v. State Bond Comm.,* 414 P.2d 546, 557 (Alaska 1966).

**19.** Brown also contends that Chapter 138 is defective under art. II, § 13 because the title, "An Act Relating to Land; And Providing for an Effective Date," does not adequately express its subject matter. Since we have concluded that "land" constitutes one subject, we believe that the requirement that the title express that subject is also satisfied. The purpose of the requirement is to prevent surreptitious introduction of legislation not indicated by the title. *See Griffin v. Sheldon,* 78 F.Supp. 466, 11 Alaska 607, 615 (1948). Chapter 138 contains no hidden provisions unrelated to its title, and "[a]nyone interested in any of the particulars of the bill would be advised by this title to look to the body of the law. . . ." *Wass v. Anderson,* 312 Minn. 394, 252 N.W.2d 131, 137 (Minn.1977).

less the State proceeds under Civil Rule 23, and the case is properly certified as a class action. While we agree that in a case of this nature the State must proceed in a representative capacity, we conclude that certification as a class action is not a prerequisite to an award of restitutory relief.

In *People v. Superior Court,* 9 Cal.3d 282, 107 Cal.Rptr. 192, 507 P.2d 1400 (Cal.1973), the California Supreme Court was confronted with substantially the same issue involved here. In that case, the California Attorney General brought suit under a statute that authorized the Attorney General to sue to enjoin misleading advertising, "but was silent as to the power of the trial court to order restitution in such a proceeding." *Id.* 107 Cal.Rptr. at 194, 507 P.2d at 1402. Noting that the statute involved "did not restrict the court's general equity jurisdiction 'in so many words, or by a necessary and inescapable inference,'" *id., quoting Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332, 1337 (1946), the court held that "a trial court has the inherent power to order, as a form of ancillary relief, that the defendants make or offer to make restitution to the consumers found to have been defrauded." 507 P.2d at 1402. In support of its holding the court relied on a number of analogous federal cases that had reached the same conclusion. *See Mitchell v. DeMario Jewelry, Inc.,* 361 U.S. 288, 291–92, 80 S.Ct. 332, 334, 4 L.Ed.2d 323, 326 (1960); *Porter v. Warner Holding Co.,* 328 U.S. 395, 398–99, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332, 1336–38 (1946); *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307–08 (2d Cir.1971); *McComb v. Frank Scerbo & Sons,* 177 F.2d 137, 138–39 (2d Cir.1949). *See also Interstate Commerce Comm'n v. B & T Transportation Co.,* 613 F.2d 1182, 1184–85 (1st Cir.1980). *But see United States v. Parkinson,* 240 F.2d 918 (9th Cir. 1956).

We find the California Supreme Court's reasoning persuasive and therefore hold that the trial court has the inherent power to order restitution in an action brought by the State under ULSPA. Nothing in that Act or in its legislative history suggests that the legislature intended to restrict the court's traditional equity powers when properly invoked. That the legislature saw fit to provide a private right of action for restitution under ULSPA does not, in our judgment, operate to curtail the court's power to award such relief at the instance of the State. *See Pierce v. Superior Court,* 1 Cal.2d 759, 37 P.2d 460, 461 (Cal.1934).

There remains, however, the question of how the State must proceed in a case of this nature; an issue that has received scant attention from the courts. As we perceive it, the principal difference between this case and one brought as a private class action is that the State is not a member of the class of persons whom it seeks to represent.[20] While the State here denies that it is representing anyone other than itself, asserting that its action is predominatly founded in law enforcement, it is clear that as to the restitution claim the State is attempting to enforce the rights of a class of private individuals. Thus, we believe that the State must be regarded as acting in a representative capacity. This conclusion finds support in the case of *Kugler v. Romain,* 58 N.J. 522, 279 A.2d 640 (N.J.1971), in which the court sustained the Attorney General's authority to maintain an action for restitution on behalf of defrauded consumers as a suit "in the nature of a class action." *Id.* 279 A.2d at 649. Although the court did not discuss at length the procedural aspects of such a suit, it did note in passing that "guidance may be found in [New Jersey statutes] which relate generally to class actions." *Id.*

We likewise conclude that guidance as to the procedural aspects of a case such as this may be found in our own rule governing the maintenance of representative actions, Civil Rule 23. Of particular impor-

---

**20.** By its own terms Rule 23 requires that a representative be a member of the class on behalf of which suit is brought. It states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all. . . ." Alaska R.Civ.P. 23(a). Thus, the State could not have brought this suit as a Rule 23 class action.

tance is that part of the Rule relating to notice to members of the class being represented. Subsection (c)(2) of the Rule in relevant part provides:

> [T]he court shall direct to the members of the class the best notice practicable under the circumstances, including notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

Alaska R.Civ.P. 23(c)(2). Following this procedure will assure that those individuals who elect to be represented by the State will be bound by the judgment, "like any other persons whose claims are prosecuted by an authorized representative." *McComb v. Frank Scerbo & Sons,* 177 F.2d 137, 140 (2d Cir.1949) (Hand, C.J., concurring). And ensuring that the judgment has this *res judicata* effect will promote judicial economy by lending finality to litigation and protect the defendant from the unfair risk of being subjected to multiple lawsuits arising from the same claim. *See* Note, *New York City's Alternative to The Consumer Class Action: The Government As Robin Hood,* 9 Harv.J.Legis. 301, 345–47 (1972); *California Corporations Code Section 25530(b): Government Agency Suit Versus The Private Class Action,* 27 Hastings L.J. 265, 279–80 (1975).

In the instant case, the trial court instructed the State to notify all Windsong lot purchasers of the State's action against Brown. The purpose of such notice was to determine which purchasers wished to participate in any order of restitution ultimately decreed by the court. This notice, however, did not comport with the requirement discussed above that the notice state that those electing to participate will be bound by the final judgment, whether favorable or not. Consequently, whether the lower court's judgment in this case would be binding on each Windsong lot purchaser remains open to question. However we do not believe that this defect requires that the case be remanded for further proceedings. Before an individual lot purchaser receives money under a judgment ordering restitution, he should first consent in writing to be bound by that judgment. That will, under the circumstances of this case, in large part accomplish the goals of the notice requirement of Rule 23(c)(2).

## C. Brown's Liability Under ULSPA

We must now determine whether the lower court's restitution order can be upheld under ULSPA.

AS 34.55.006 provides:

> It is unlawful for a person, in connection with the offer, sale or purchase of subdivided land directly or indirectly, to knowingly
>
> (1) employ a device, scheme or artifice to defraud;
>
> (2) make an untrue statement of a material fact or omit a statement of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) engage in an act, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

A person who disposes of subdivided land [21] in violation of this section is civilly liable to a purchaser

> ... unless in the case of an untruth or omission it is proved that the purchaser

---

21. "Subdivided land" is defined in AS 34.55.-044(6) as including "land which is divided or is proposed to be divided for the purpose of disposition into two or more lots, parcels, units or interests...." That Brown was selling subdivided land at the time the State instituted this action is not disputed. Since Brown received an exemption from the registration provisions of the federal Interstate Land Sales Full Disclosure Act, *see* note 4 *supra,* he is also exempt from the registration provisions of ULSPA. AS 34.55.042(a)(8). This does not, however, immunize Brown from liability under AS 34.55.-006. *See id.;* Governor's Transmittal Letter, 1977 House Journal 65.

knew of the untruth or omission or that the person offering or disposing of subdivided land did not know and in the exercise of reasonable care could not have known of the untruth or omission. AS 34.55.030(a). *See Stepanov v. Gavrilovich,* 594 P.2d 30, 33 (Alaska 1979).

▮ With respect to the eighteen individuals who purchased Windsong lots on or after September 21, 1977, the date when ULSPA became applicable to sales of in-state land, Brown does not seriously dispute his liability. The trial court found that Brown knew, prior to developing Windsong, of the facts relating to the flood hazard. Brown does not contest those findings, nor does he contest the trial court's findings that the facts he misrepresented or omitted to mention were material. Since Brown had ample opportunity but failed to show facts which could constitute a defense under AS 34.55.030(a), ordering restitution under ULSPA was proper as to those individuals who purchased their lots on or after September 21, 1977.

The vast majority of purchasers on whose behalf restitution was ordered bought their lots prior to this date, however. Liability as to those purchasers under ULSPA, Brown argues, would require impermissible retrospective application of the Act to in-state subdividers. The State contends that because ULSPA is "remedial," it can be given retroactive effect. The State further claims that liability as to the pre-September 21, 1977 purchasers can be predicated on conduct by Brown that occurred after that date, thereby avoiding retrospective application of ULSPA.

▮ AS 01.10.090 provides that "[n]o statute is retrospective unless expressly declared therein." Chapter 138, Sections 1–8, SLA 1977, which added AS 34.55.006 and amended ULSPA to apply to in-state subdividers, contains no such express declaration. Nor does its legislative history indicate that retrospective application was intended.[22] Recently, we observed:

> We have heretofore closely adhered to the clear mandate expressed in the statutory language. Statutes are not to be applied retroactively unless the language used by the legislature indicates the contrary. *City and Borough of Juneau v. Commercial Union Ins. Co.,* 598 P.2d 957, 958–59 (Alaska 1979); *Davenport v. McGinnis,* 522 P.2d 1140, 1142 (Alaska 1974); *Stephens v. Rogers Constr. Co.,* 411 P.2d 205, 208 (Alaska 1966).

*Matanuska Maid, Inc. v. State,* 620 P.2d 182, 187 n. 8 (Alaska 1980). In that case we did hold that "mere procedural changes which do not affect substantive rights are not immune from retrospective application." *Id.* at 187. But the broad prohibitory language of AS 34.55.006 can hardly be characterized as bringing about mere procedural changes. Thus, we hold that ULSPA cannot be retrospectively applied to hold Brown liable for conduct predating its application to in-state land sales.[23] We note that this conclusion is in accord with the construction given to the Interstate Land Sales Full Disclosure Act, ULSPA's federal counterpart. *See Davis v. Rio Rancho Estates, Inc.,* 401 F.Supp. 1045, 1048 (S.D.N.Y. 1975).

---

**22.** AS 01.10.020 provides:

The provisions of §§ 40–90 of this chapter shall be observed in the construction of the laws of the state unless the construction would be inconsistent with the manifest intent of the legislature.

In *City and Borough of Juneau v. Commercial Union Ins. Co.,* 598 P.2d 957 (Alaska 1979), we adverted to this provision as modifying to some extent the "iron-clad language" of AS 01.10.-090. *Id.* at 958 n. 3. Thus, in *Zurfluh v. State,* 620 P.2d 690 (Alaska 1980), we held that AS 12.55.086, which relates to sentencing in criminal cases, could be retroactively applied for a

153-day period since "[t]he apparent intent of the legislature as [sic] that the benefits of this type of sentencing should be available to trial judges as soon as possible...." *Id.* at 693.

**23.** The State's argument that ULSPA is "remedial" and thus deserving of retroactive application on that basis alone is, in our opinion, without merit. Even when a statute is remedial in nature, it will be construed retroactively only if the legislative intent clearly indicates that retroactive operation is intended. *See* 2 C. Sands, Sutherland Statutory Construction § 41.04, at 253 (4th ed. 1973).

The State alternatively argues that liability for restitution to pre-September 21, 1977 purchasers can be premised on Brown's later "lulling" activities, which, the State urges, constitute "fresh" ULSPA violations. Reference is made to the trial court's findings that Brown's letter to all Windsong lot purchasers, sent in January 1978, contained numerous misrepresentations designed to induce purchasers to continue making their property payments. According to the State, these misrepresentations were made "in connection with the offer, sale or purchase of subdivided land," thereby triggering liability under AS 34.55.006.

■ The State's argument in large part centers on the Act's definition of "offer." [24] AS 34.55.044(2) defines that term as including "every inducement, solicitation or attempt to encourage a person to acquire an interest in land, if undertaken for gain or profit." The State reasons that Brown's "lulling" activities were "inducements" or "attempts" to get purchasers to "acquire" further interests in land.

■ We think it would be straining the language of the Act to hold that post-sale conduct designed to induce the continuation of payments constitutes an "offer" as that term is defined above. The continuation of payments under the land sales contracts involved here did not result in the acquisition by purchasers of further interests in

land. Legal title to the property vested in the purchasers at the time the contracts were signed.[25]

The State's reliance on *Husted v. Amrep. Corp.*, 429 F.Supp. 298 (S.D.N.Y.1977) is misplaced. That case involved the question whether a violation of the antifraud provisions of the federal Interstate Land Sales Full Disclosure Act could occur after the sale of land so that the plaintiff's claim would not be barred by the applicable statute of limitations. The court held that such a violation could occur, but emphasized that unlike S.E.C. Rule 10b-5, upon which the section at issue was in part modelled, the Act did not require that the violation occur "in connection with" the sale. *Id.* at 307. *See also Fogel v. Sellamerica, Ltd.*, 445 F.Supp. 1269, 1274–75 (S.D.N.Y.1978). AS 34.55.006, like the S.E.C. Rule, requires that the conduct complained of occur "in connection with" the sale.

This is not to say that fraudulent post-sale conduct could never constitute a violation of AS 34.55.006. If such conduct in fact occurred "in connection with" the offer, sale or purchase of subdivided land, then it would be actionable. Our review of federal decisions construing the scope of the "in connection with" requirement of S.E.C. Rule 10b–5 suggests that activity post-dating the time that the initial contract to

---

**24.** The State also points to the word "disposition," which AS 34.55.044(1) defines as including the "sale, lease, assignment, award by lottery, *or any other transaction concerning a subdivision,* if undertaken for gain or profit." (Emphasis added). Noting that AS 34.55.-030(a), the civil remedies section, creates liability when a person "disposes" of land in violation of AS 34.55.006, the State argues that Brown's "lulling" activities constituted "other transactions concerning a subdivision," and hence created liability under the Act. In our view, the language relied upon, preceded as it is by specific examples of "transactions," i.e., "sale, lease," etc., should be construed under the doctrine of *ejusdem generis* as limited to transactions involving the transfer of an interest in land. *See Chugach Electric Ass'n v. Calais Co.*, 410 P.2d 508, 509–10 (Alaska 1966). Because Brown's "lulling" activities were not, under our construction, "transactions concerning land" within the meaning of AS 34.55.-

044(1), the State's reliance on that section is misplaced.

**25.** Under the deed of trust and promissory note arrangement used by Brown in selling Windsong lots, title to the property passed to the purchaser immediately upon signing the purchase agreement. This is not to say, however, that our conclusion would differ if the sales had been made pursuant to a conditional land sales contract in which legal title technically does not pass until the final installment is paid. For under this arrangement equitable title vests immediately in the purchaser upon execution of the contract, and the seller retains legal title only as a security interest for the unpaid portion of the purchase price. *Davis v. Rio Rancho Estates, Inc.*, 401 F.Supp. 1045, 1048 (S.D. N.Y.1975). In our judgment, the payment of installments by the equitable owner would not constitute further acquisitions of land under AS 34.55.044(2).

purchase is signed is not necessarily immune from liability. For example, in *Goodman v. Epstein,* 582 F.2d 388 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), the court noted that "the crucial fact ... is whether an investment decision remains to be made by the party from whom disclosure is withheld, and not upon when the agreement to purchase or sell was executed." *Id.* at 413; *see also Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1286–87 (N.D.Ill.1981). *Goodman* involved a limited partnership agreement in which the plaintiff limited partners were in an "on-going relationship" with the defendant general partners. 582 F.2d at 412. From time to time, the limited partners were called upon to make additional capital contributions based upon the partnership's performance. Although the conduct complained of occurred after the partnership agreement was signed, the court held that later nondisclosure of material facts by the general partners to induce continued payment of capital contributions by the limited partners was actionable under Rule 10b–5. However, the court was careful to distinguish the situation where

> ... the investment decision was completed at the time the parties entered into the agreement, the contract being, in effect, a "one-shot deal." No continuing relationship was contemplated. All that was left undone was the ministerial exchange of money for the stock.

*Id.* at 412. In such an instance, the fraudulent conduct must occur at or before "the time when the parties to the transaction are committed to one another." *Id.,* quoting *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 891 (2d Cir.1972). *See also Clinton Hudson & Sons, v. Lehigh Valley Cooperative Farms, Inc.,* 73 F.R.D. 420, 425 (E.D. Pa.), *aff'd mem.,* 586 F.2d 834 (3d Cir.1977).

Applying these principles to the instant case, we conclude that Brown's post-sale "lulling" conduct directed at pre-September 21, 1977 purchasers was not "in connection with" the sales to such purchasers. Brown's relationship with these purchasers was "in effect, a 'one-shot deal,' " *Goodman,* 582 F.2d at 412, rather than one involving a "series of 'investment decisions.' " *Id.* at 413. The parties were committed at the time the contracts were executed and the continued payments required thereunder involved nothing more than a means of effectuating "the ministerial exchange of the money" for the land. *Id.* at 412. Accordingly, Brown's liability, if any, to pre-September 21, 1977 Windsong lot purchasers cannot be predicated on violations of ULSPA.

## IV. COMMON LAW FRAUD

We must now decide whether restitution as to the fifty-three purchasers who bought lots before the effective date of the ULSPA amendments can be upheld on the basis of common law fraud. This was in fact the basis for the trial court's restitution order. Brown contends that the State was without authority to enforce the common law rights of these purchasers. In addition, he argues that the trial court erred in applying the common law since the parties had tried the case under ULSPA.

### A. The Attorney General's Common Law Powers

The duties of the Attorney General are statutorily set forth in AS 44.23.020(b). Among other things, that statute states that the Attorney General shall "perform all other duties required by law or which usually pertain to the office of attorney general in a state." AS 44.23.020(b)(7). In *Public Defender Agency v. Superior Court, Third Judicial District,* 534 P.2d 947, 950 (Alaska 1975), we stated that this language "indicates that the office of the Attorney General is to function with those powers and duties normally ascribed to it at common law." We further noted:

> Under the common law, an attorney general is empowered to bring any action which he thinks necessary to protect the public interest, and he possesses the corollary power to make any disposition of the state's litigation which he thinks best. This discretionary control over the legal business of the state, both civil and crimi-

nal, includes the initiation, prosecution and disposition of cases.

When an act is committed to executive discretion, the exercise of that discretion within constitutional bounds is not subject to the control or review of the courts. To interfere with that discretion would be a violation of the doctrine of separation of powers.

*Id.* (Citations omitted).

■ We believe that the above language forecloses any argument that the State is without authority to bring suit in the absence of express statutory authority. This view finds ample support in the decisions of other jurisdictions where the attorney general's common law powers are recognized. *See, e.g., State v. Bristol-Myers Co.,* 470 F.2d 1276, 1278 (D.C.Cir.1972) (construing Illinois Law); *D'Amico v. Board of Medical Examiners,* 11 Cal.3d 1, 112 Cal.Rptr. 786, 520 P.2d 10, 20 (Cal.1974); *State ex rel. Shevin v. Yarborough,* 257 So.2d 891, 894–96 (Fla.1972) (Ervin, J., concurring); *Lowell Gas Co. v. Attorney General,* 377 Mass. 37, 385 N.E.2d 240, 247–48 (Mass.1979); *Michigan State Chiropractic Ass'n v. Kelly,* 79 Mich.App. 789, 262 N.W.2d 676, 677 (Mich. 1977); *Gandy v. Reserve Life Insurance Co.,* 279 So.2d 648, 649 (Miss.1973); *Hyland v. Kirkman,* 157 N.J.Super. 565, 385 A.2d 284, 289–90 (N.J.Super.1978); *State ex rel. Derryberry v. Kerr-McGee Corp.,* 516 P.2d 813, 818 (Okl.1973). This authority has been held to confer standing on the attorney general to seek redress for common law fraud. *Lowell Gas Co. v. Attorney General,* 377 Mass. 37, 385 N.E.2d 240, 247–48 (Mass. 1979); *Hyland v. Kirkman,* 157 N.J.Super. 565, 385 A.2d 284, 289–90 (N.J.Super.1978).

■ We therefore hold that the State has the authority to bring suit in the public interest on the basis of common law fraud to obtain restitution for defrauded land purchasers. While it is not the court's function to pass upon the Attorney General's determination of what is or is not in the "public interest," *see Public Defender Agency v. Superior Court, Third Judicial District,* 534 P.2d 947, 950 (Alaska 1975), we do note that the trial court in this case found:

The State has an interest in preventing unjust enrichment by land developers based on widespread misrepresentations and nondisclosure. . . . Here the defendants advertised the land sales in local newspapers, reaching about half the population of the state. The State also has an interest in protecting the economy of the State against developers who misrepresent the desirability of the land they sell. . . . The State also has a pecuniary interest in this particular case since its resources may be called upon to aid victims of a potential flood in the Windsong Subdivision.

B. Brown's Liability For Common Law Fraud

The State did not allege that Brown should be held liable on the basis of common law fraud. The focus of the State's case against Brown was on ULSPA. On the first day of the trial, the lower court granted summary judgment in favor of Brown's engineer, Hausam, on the theory that his involvement in the Windsong development ceased prior to the effective date of the ULSPA amendments, which could not be retroactively applied. In response to a question by Brown's counsel, the trial court indicated that this ruling would apply to Brown as well, or in other words that Brown too could not be held liable for acts pre-dating September 1, 1977. During the trial, Brown presented evidence relating only to the defense of innocent misrepresentation provided in AS 34.55.030(a), the civil remedies section of ULSPA. Nevertheless, the trial court *sua sponte* relied on common law fraud to hold Brown liable for restitution to all Windsong lot purchasers who had elected to participate in the State's action, regardless of when they purchased their lots.

■ We agree with Brown that his right to a fair trial was jeopardized by the trial court's adoption of a new theory of the case. The focus of the pleadings, discovery, preliminary hearings, and earlier motions on ULSPA, coupled with the trial court's

dismissal of Hausam from the case and assurance that the basis therefor would apply to Brown, could reasonably have led Brown to believe that his liability, if any, would be predicated on ULSPA, and ULSPA alone. Consequently, in preparing his defense, he had no notice that he was going to have to defend against fifty-three separate restitution claims based on the common law. Under these circumstances, we cannot countenance the trial court's re-engineering of the case to hold Brown liable for common law fraud. *Compare Clary Insurance Agency v. Doyle,* 620 P.2d 194, 200–01 (Alaska 1980).

We conclude, therefore, that as to Brown's liability to pre-September 21, 1977 purchasers, the case must be remanded for supplemental evidentiary hearings. On remand the parties and the lower court should devote particular attention to the issue of reliance, a necessary element to a common law claim for rescission of a land sales contract. *Cousineau v. Walker,* 613 P.2d 608, 612 (Alaska 1980). Although the lower court here found that all Windsong lot purchasers had relied on the false information supplied them by Brown, the present record does not support this finding. In all, only twelve of the purchasers listed in the court's restitution order testified either at the hearing on the preliminary injunction or

at the trial. Of these twelve, only ten bought their lots prior to September 21, 1977. Because of this evidentiary void, we believe that it would be unfair, on the present record, to hold Brown liable to the pre-September 21, 1977 purchasers on the basis of common law fraud. *See Landex, Inc. v. State ex rel. List,* 582 P.2d 786, 790–92 (Nev.1978). While Brown may have had the burden of going forward to produce evidence of non-reliance in order to avoid liability,[26] his failure to do so below may have been due to the absence of any notice that he might be held liable for common law fraud. Accordingly, on remand Brown must be afforded the reasonable opportunity to present such evidence, if any, as well as evidence tending to establish any other defenses he may have to the common law claims.[27]

We do not agree with our dissenting colleague that the State's case against Brown as to the pre-September 21, 1977 purchasers should simply be dismissed. The trial court had inherent discretionary authority to inject the theory of common law fraud into the case. A trial court's authority to require the presentation of new legal theories is implied in Alaska R.Civ.P. 16(e) authorizing amendment of a pre-trial order without limitation as to time "to prevent manifest

26. According to Williston: "Where representations have been made in regard to a material matter and action has been taken, in the absence of evidence showing the contrary, it will be presumed that the representations were relied on." 12 Williston on Contracts § 1515, at 480 (W. Jaeger 3d ed. 1970); *see also* Restatement (Second) of Contracts § 167 comment b, illustration 3 (1981). In *Vasquez v. Superior Court,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 972–73 (Cal.1971), the California Supreme Court, relying on the above-stated rule, held that issues of reliance would not preclude certification of an action as a class action because if it was shown that alleged misrepresentations were material, an inference of reliance would arise as to the entire class. *See also Occidental Land, Inc. v. Superior Court,* 18 Cal.3d 355, 134 Cal.Rptr. 388, 556 P.2d 750, 754 (Cal.1976). *But see Newman v. Tualatin Development Co.,* 287 Or. 47, 597 P.2d 800, 803–04 (Or.1979); *Johnson v. Travelers Ins. Co.,* 89 Nev. 467, 515 P.2d 68, 72 (Nev.1974).

While we have no quarrel with the rule suggested by Williston and the Restatement, its application

> cannot be utilized to establish reliance as to the entire class without examining the facts and circumstances of each individual transaction which may establish that the misrepresentation was not the inducing factor. The defendant should be given the opportunity to examine each purchaser individually as to causation.

*Hoffman v. Charnita, Inc.,* 58 F.R.D. 86, 91 (M.D.Pa.1973). In our view, the absence of any notice to Brown that he was defending against common law fraud claims deprived him of a fair opportunity to rebut any inference of reliance that may have arisen.

27. What we have earlier said about requiring a purchaser's written consent to be bound by the court's final judgment as a condition to participating in any restitutory relief is likewise applicable to pre-September 21, 1977 purchasers who elect, on remand, to continue being represented by the State.

injustice," and in the penultimate sentence of Alaska R.Civ.P. 15(b) allowing the amendment of pleadings at any time "when the presentation of the merits of the action will be subserved thereby" and no prejudice will result.

The authority to decide a case on an unplead legal theory should be sparingly exercised. In particular it should only be used when the new theory applies to the transaction in issue, is related to the theories presented by the parties, and is necessary for a proper and just disposition of the case. Here, those standards can be reasonably regarded as having been fulfilled.

█ Where prejudice will result a court either should not employ a new theory or should take steps to eliminate the prejudice by giving notice that the new theory will be used and affording an opportunity to the parties to present evidence and arguments relevant to it. The error committed by the trial court in this case was not in invoking the theory of common law fraud, but in failing to give the parties notice that it would do so along with an opportunity to adjust their cases accordingly.

In *MacCormack v. Robins Construction,* 11 Wash.App. 80, 521 P.2d 761 (Wash.App. 1974) the plaintiffs brought suit alleging that the defendants had sold them defective homes in violation of the State's Consumer Protection Act. The lower court concluded that plaintiffs were not entitled to relief under the state act but, on its own initiative, transformed the suit into a claim for damages based on common law breach of warranty. The lower court then granted the defendants' motion to reopen the case to present additional evidence. When the case was later appealed, this action by the trial court was upheld as within its discretion.

> In the case at bench, it is apparent from the record that the trial court allowed the defendants sufficient additional time and opportunity to present additional evidence and to cure any surprise defendants may have experienced as a result of

the trial court's disposition of the case....

*Id.* 521 P.2d at 763.

Here, remand will do what the trial court should have done once the decision to invoke common law fraud was made. It will give Brown an opportunity to present evidence relevant to the common law fraud theory and thus eliminate the possibility of prejudice which would otherwise result from the court's reliance on that theory. That trial of the common law fraud issue may result in Brown being liable to pre-September 1977 purchasers, whereas under the statute he is not, is not the type of prejudice which precludes a remand. *See Wright v. Vickaryous,* 598 P.2d 490, 496–97 (Alaska 1979).

## V. JURY TRIAL

The State correctly notes that Brown did not demand a jury trial until more than thirty days after he had answered the State's second amended complaint. Under Civil Rule 38, demand for a jury trial must be made not later than 10 days after the service of the last pleading directed at an issue for which the right to a jury trial is claimed. Alaska R.Civ.P. 38(b). The Rule further provides that the untimely filing of such a demand constitutes a waiver of the right Alaska R.Civ.P. 38(d); *Hollembaeck v. Alaska Rural Rehabilitation Corp.,* 447 P.2d 67, 68 (Alaska 1968). But, as Brown points out, the State twice amended its complaint after Brown's jury demand, each time adding additional parties and raising new issues. We need not decide, however, whether Brown's demand was timely, for, even if it was, it is clear that Brown had no right to a jury trial in this case.

█ Article I, section 16 of the Alaska Constitution provides in relevant part:

> In civil cases where the amount in controversy exceeds two hundred and fifty dollars, the right of a trial by a jury of twelve is preserved to the same extent as it existed at common law.

At common law, the existence of a right to trial by jury depended upon whether the claim asserted was legal or equitable in

nature. *Ross v. Bernhard,* 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed.2d 729, 733 (1970). When only equitable relief is sought, there is no right to a jury trial. 5 Moore's Federal Practice ¶ 38.17 (2d ed. 1981); *see Loomis Electronic Protection, Inc. v. Schaefer,* 549 P.2d 1341, 1344 (Alaska 1976). In this case, the State sought injunctive and restitutory relief only.[28] Such relief being equitable, 5 Moore's Federal Practice ¶ 38.24 (2d ed. 1981), Brown was not entitled to a jury trial and the lower court thus did not err in refusing Brown's jury trial demand.

**28.** In its original complaint, the State sought civil penalties as well, but this claim was dropped prior to Brown's demand for a jury trial. We therefore need not decide whether a right to a trial by jury would exist had the State sought civil penalties under either ULSPA or the Consumer Protection Act. *See State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 526, 538–39 (Alaska 1980) (Matthews, J., dissenting).

**29.** Included among the practices enjoined are (1) using contracts which contain provisions that loss of the property can result without notice or a hearing in a court of competent jurisdiction (3 AAC 20.060(a)(7)); (2) using contracts that provide for acceleration of payments upon default (3 AAC 20.060(a)(6)); (3) representing to prospective purchasers that they must act quickly to purchase land at a savings because the price is about to increase, unless a decision has in fact been made to increase the price and the increased price remains in effect for at least 30 days (3 AAC 20.110(1)); (4) representing to purchasers that the seller will buy back or resell the purchased property unless this is true (3 AAC 20.120(1)); (5) failing to inform purchasers that any evidence of indebtedness can be assigned (3 AAC 20.130(3)); (6) advertising "homesites" as for sale when the land has not been approved for utilities (3 AAC 20.080(3)); and (7) failing to include on the face of any agreement that the purchaser has a right to rescind for any reason within five days (3 AAC 20.270(b)).

**30.** Brown also claims that these regulations are inconsistent with legislative intent, and that application of them to him would be a denial of procedural due process. The basis for Brown's first argument is that since the regulations were promulgated prior to the effective date of the ULSPA amendments, the legislature could not have intended them to apply to in-state sellers of land. In effect, Brown argues that administrative regulations must be re-promulgated before they may be applied to enforce an amended statute that covers a new class of

## VI. VALIDITY OF THE INJUNCTION

As part of its final judgment, the lower court permanently enjoined Brown from engaging in certain practices prohibited by the administrative regulations promulgated under ULSPA, 3 AAC 20.010–20.390.[29] Brown claims that this part of the injunction is invalid because the regulations were not adopted in accord with statutory notice requirements.[30] We disagree.

AS 34.55.020(a)[31] authorizes the Department of Commerce to prescribe regulations as are necessary to accomplish ULSPA's

persons. We think that requiring such a procedure would be unduly burdensome to the administrative agency when, as here, the regulations are consistent with, and not rendered unreasonable or arbitrary by, the statute as amended. *See Kenai Peninsula Fisherman's Cooperative Ass'n v. State,* 628 P.2d 897, 906 (Alaska 1981).

Brown's due process argument is that since the regulations when promulgated applied only to out-of-state subdividers, he reasonably believed that he had no interest in them. Thus, he argues that application of the regulations to him without re-promulgating them denies him notice of and an opportunity to be heard in the administrative process. The only authority cited by Brown in support of his argument is *City of Homer v. State,* 566 P.2d 1314, 1319–20 (Alaska 1977). His reliance on that case is misplaced, however, since it involved due process requirements in connection with administrative action that is adjudicatory, rather than legislative, in nature. As Professor Davis notes, numerous regulations are promulgated without notice to or participation by those that might be affected. 1 K. Davis, Administrative Law Treatise § 6.01 (1958). In our judgment, Brown's due process argument is without merit.

**31.** AS 34.55.020(a) provides:

The department shall prescribe regulations which shall be adopted, amended, or repealed in compliance with the Administrative Procedure Act (AS 44.62). The regulations shall include but not be limited to provisions for advertising standards to assure fair and full disclosure; provisions for escrow or trust agreements or other means reasonably to assure that all improvements referred to in the application for registration and advertising will be completed and that purchasers will receive the interest in land contracted for; provisions for operating procedures; and other provisions as are necessary or proper to accomplish the purpose of this chapter.

purpose, and states that such regulations shall be adopted in compliance with the Administrative Procedure Act, AS 44.62.-010–44.62.650. AS 44.62.190 requires that notice of proposed agency action be given at least thirty days before regulations are adopted. The content of such notice is governed by AS 44.62.200, which, among other things, requires that the notice contain "an informative summary of the proposed subject of agency action." AS 44.62.200(a)(3). It is this requirement that Brown claims was not complied with here.

The challenged regulations were adopted after publication of the following notice:

NOTICE IS HEREBY GIVEN that the Department of Commerce ... proposes to adopt regulations in Title 3 of the Administrative Code to implement AS 34.55 Uniform Land Sales Practices Act as follows:

| | |
|---|---|
| Article 1. | General Provisions |
| Article 2. | Filing Procedures |
| Article 3. | Unfair Acts and Practices |
| Article 4. | Advertising and Promotion Plans |
| Article 5. | Protection of Purchasers |
| Article 6. | Severability |

Brown contends that this notice was insufficient to convey any meaningful description of the proposed agency action.

■■■■ AS 44.62.100(a) establishes a rebuttable presumption that the procedural requirements for the promulgation of administrative regulations have been satisfied. When a regulation is challenged for failure to comply with these requirements, the violation must be "substantial" before the regulation will be declared invalid. AS 44.62.300; *Kingery v. Chapple,* 504 P.2d 831, 834 (Alaska 1972). We think that Brown

has failed to show a violation of the informative summary requirement substantial enough to overcome the statutory presumption of validity. The contents of the above summary gave members of the public sufficient information to decide whether their interests could be affected by the agency action and thus whether to make their views known to the agency.[32] Accordingly, that portion of the trial court's judgment permanently enjoining Brown from violating the administrative regulations implementing ULSPA is affirmed.

## VII. FIRST NATIONAL BANK AS A DEFENDANT

The relief sought by the State against First National Bank of Anchorage was a declaratory judgment that the Bank was not a "holder in due course" of the Windsong lot purchasers' promissory notes. The Bank held these notes as security for its loans to Brown used to finance the Windsong Subdivision. Although when delivered the notes were unendorsed, the collateral and loan agreements between Brown and First National authorized the Bank to endorse the notes to itself on Brown's behalf. After a time it did so and then notified purchasers that they were obligated to make their payments to the Bank, despite the lower court's directive that those purchasers seeking restitution should make their payments to the court registry. It was at this point that the State amended its complaint to add First National as a defendant.

■■■ The lower court dismissed the State's action against the Bank, reasoning that the State was without standing to

---

**32.** That this is all that AS 44.62.200(a)(3) requires finds support in its legislative history. The precursor to that section required that the notice of proposed agency. action contain "[e]ither the express terms or an informative summary of the proposed agency action." Ch. 143, § 6(3), SLA 1959. In 1970, the legislature changed this language to that presently found in AS 44.62.200(a)(3). *See* ch. 185, § 1, SLA 1970. A report from the House Judiciary Committee reveals that the change came about because it was felt that under the prior version notice of proposed regulations had to be very detailed and specific; a requirement that the

Judiciary Committee believed was too restrictive and hence undesirable. *See* 1970 House Journal 917–18. Thus, it is clear that the legislature intended that the "informative summary" requirement be liberally construed. *Cf.* AS 44.62.200(b) (a regulation may vary from the content specified in the summary if "the subject matter remains the same and the original notice was written so as to assure that members of the public are reasonably notified of the proposed subject of agency action in order for them to determine whether their interests could be affected by agency action on that subject").

assert potential claims that individual lot purchasers might have against First National because the Bank had violated no law.[33] In our view, the lower court impermissibly substituted its own judgment for that of the executive official charged with bringing suit when, in his judgment, the public interest requires, and therefore erred in dismissing the State's action against First National.

We have already had occasion to discuss the Attorney General's broad common law powers. What we have said is equally applicable to the question of the State's authority to sue the Bank.

> Under the common law, an attorney general is empowered to bring *any* action which *he* thinks necessary to protect the public interest. . . .

*Public Defender Agency v. Superior Court, Third Judicial District,* 534 P.2d 947, 950 (Alaska 1975) (emphasis added). And, subject to constitutional bounds, what is or is not in the public interest is a matter committed to the Attorney General's sound discretion. *Id.* That the State saw fit to try to prevent First National from collecting on notes executed by persons whom it had reason to believe may have been the victims of fraud, is not a decision subject to the control or review of the courts. The trial court's concern that allowing the State to sue First National in the absence of a specific statutory violation by the Bank would create a "horrendous risk of overreaching" by the State as litigant, is answered by the observation that "the fact that the exercise of power may be abused is no sufficient reason for denying its existence." *United*

States v. San Jacinto Tin Co., 125 U.S. 273, 284, 8 S.Ct. 850, 856, 31 L.Ed. 747, 751 (1888).

We conclude, therefore, that the trial court erred in dismissing the State's claim against First National. On remand, the State must be given the opportunity to show, with respect to the individual purchasers represented,[34] that the Bank does not occupy the status of a "holder in due course" of the various purchasers' promissory notes.

The judgment is AFFIRMED in part and REVERSED in part and the case is REMANDED for further proceedings consistent with this opinion.[35]

RABINOWITZ, Chief Justice, dissenting in part.

My only disagreement with the court's disposition of the various issues in this appeal concerns its holding that determination of Brown's liability to pre-September 21, 1977 purchasers on the basis of common law fraud must be remanded for a second trial. The court reaches its remand conclusion on the following rationale: "The state did not allege that Brown should be held liable on the basis of common law fraud." Agreeing that Brown's right to a fair trial was jeopardized by the trial court's adoption of a new theory of the case, and refusing to countenance the trial court's re-engineering of the case to hold Brown liable for common law fraud, the majority has concluded that the matter should be remanded for trial of the common law fraud question.

I do not believe that a remand to address the issue of common law fraud is appropri-

---

**33.** Subsequent to its decision to dismiss the Bank, the trial court expressed as a tentative opinion the view that the Bank was not a holder in due course and thus would be subject to the same defenses available to a purchaser in an action on the note by Brown. The court correctly pointed cut, however, that this view was not an adjudication binding on the Bank.

**34.** First National's argument that permitting the State to sue will require the Bank to engage in litigation which offers it no prospect of obtaining complete relief is disposed of by our earlier holding that those individuals electing to be represented by the State must first consent to be bound by the court's final judgment.

**35.** In light of our disposition of the case, the lower court's award to the State of costs and attorney's fees must be vacated. We do not address the State's claim that the lower court erred in denying its request for pre-judgment attachment under AS 09.40.010. Since the State has represented to the court that it has been unable to find significant assets other than Windsong lots on which to execute during the pendency of this appeal, and since the State will have a partial judgment on which to execute following remand, this issue is moot.

ate. The case against Brown was tried solely on the theory that Brown was liable under the ULSPA, not on the basis of common law fraud. Further, it cannot be shown that the issue of common law fraud was tried with the express or implied consent of the parties. In short, I think it unfair to require Brown to go through a second trial in circumstances where the state never asserted a claim of common law fraud in the original proceedings.

Even if I was persuaded that the issue of common law fraud had been raised and tried, in my view the appropriate disposition of the case would be to reverse a significant portion of the superior court's judgment ordering restitution to purchasers. As to these fifty-odd pre-September 21, 1977 purchasers, there is no evidence in the record concerning what misrepresentations, if any, were made to them or whether a particular purchaser relied on any such misrepresentation.[1] In short, I fail to comprehend the justification for the court's ordering a remand which will afford the state a second opportunity to attempt to present sufficient evidence to show that a particular purchaser is entitled to rescind his or her transaction with Brown.[2]

In my view, the court's disposition of the common law fraud issue also raises basic

1. Although the superior court's order permits numerous purchasers to rescind their purchases and obtain a refund of their money on the ground that they were defrauded by Brown, there is no evidence in the record concerning most of these persons' dealings with Brown. A total of fifteen purchasers testified (several on Brown's behalf), and their testimony establishes that Brown or his agents told different things to different persons and that purchasers had varying amounts of knowledge about the condition of the property that they were purchasing. In other words, it is impossible to infer from the testimony of record that Brown defrauded dozens of purchasers, and thus the superior court's judgment lacks evidentiary support.

   For example, on the issue of Brown's alleged failure to inform purchasers that their riverside parcels might flood, several of the state's witnesses testified that they knew the area was prone to flooding. Another two witnesses explained that they were told by Brown's representative of the subdivision's history of flooding. Many purchasers told stories much like that told by Thomas Doggett, who explained that he had bought his lot "more or less on impulse" within two hours of first seeing it and that he "didn't think about it, didn't research it, didn't ask any of the neighbors nothing." In other words, even if the testimony of some purchasers established that those persons were entitled to rescind their transactions, that testimony also establishes that it is impossible to infer that Brown is liable to other purchasers; the testimony of record does not establish that all purchasers were in the same position or that they all were told the same thing.

2. First, this is not a case in which the state is the victim of poor lawyering or inartful pleading. The state was permitted to amend its complaint four times over the course of almost a year. The state had ample opportunity, both before and after conducting extensive investi-

gations, to tailor its pleadings and theories to fit its view of the facts.

   Second, this is not a case in which defrauded consumers would be left without a remedy should the state be denied the remand opportunity to litigate the common law fraud issue on their behalf. Each and every landowner is free to maintain an individual suit should he or she wish to rescind the transaction or to recover damages.

   Third, this is not a case in which significant judicial resources would be saved by litigating all purchasers' claims in a single class action type lawsuit. The state must prove its allegation of fraud as to each purchaser. On remand, the proceedings could become a confusing series of up to 53 mini-trials.

   Fourth, this is not a case in which the state's objectives would be frustrated should individual purchasers be required to bring separate suits to vindicate their rights, if any. The state has repeatedly represented that its objective is not to redress individual purchasers' grievances but rather to vindicate its separate interest in "public law enforcement" by enjoining Brown from violating state law. Indeed, the state has already obtained precisely the relief that it claims to have been seeking, an injunction.

   Fifth, this is a case in which Brown will suffer significant prejudice should the case be remanded for a second trial. There is the obvious prejudice of forcing Brown to incur the expense of a second trial which would not have been necessary had the state raised the theory that it now wishes to rely upon, and the prejudice of possible liability to purchasers who would not have been entitled to recover under the state's statutory theory of liability. Further, there is no assurance that Brown will not be faced with separate suits brought by individual purchasers after the state's suit comes to an end. The state's suit has no res judicata effect as to individual landowners, and landowners are not required to elect to participate in any judgment obtained by the state until

considerations of fairness. Brown's engineer, Neil Hausam, moved for summary judgment on the ground that the ULSPA could not be applied to reach his activities. The superior court granted summary judgment on that ground. In response to Brown's inquiry at the outset of the trial, the superior court indicated that "implicit in what the court has already ruled with regard to Mr. Hausam is that any claim based upon anyone who relied—whose actions were motivated by acts that took place prior to the effective date of the amendment must fail." The record indicates that Brown obviously was proceeding under the assumption that, if Hausam was out of the case because the act could not be applied retroactively, so was he unless the state could prove some post-ULSPA misbehavior affecting a pre-ULSPA purchaser. In my view, inconsistent application of the law in this case has resulted in a basically unfair decision against Brown.

after the lawsuit has drawn to a close. Thus, if the state loses, individual purchasers are free to ignore the state's suit and to file their own lawsuits; even if the state wins, no landowner is bound by the judgment, although it is plausible to assume that most landowners will elect to participate in the judgment rather than to bring separate suits.